67078. HOUSING AUTHORITY OF ATLANTA v. FAMBLE.
67079. VILLA MONTE HOMES, INC. et al. v. GARDNER et al.

QUILLIAN, Presiding Judge.

These appeals arise out of the tragic deaths of two sisters, Lisa Famble, age 7 and Yvonne Famble, age 8, who on August 29, 1979, drowned in an overflowing storm sewer located to the rear of the Villa Monte housing complex where they lived with their mother, the plaintiff Brenda Famble Gardner. Subsequently, their mother and Roy Gardner brought an action to recover for the wrongful death of the two children and for their conscious pain and suffering prior to their deaths (brought under a separate count by Brenda Gardner, as administratrix of the children's estate). Named as defendants were: Atlanta Housing Authority (Atlanta Housing), National Homes Construction Corporation (National Homes Construction), National Homes Corporation (National Homes), Morrison J. Simms & Associates, P. C., Villa Monte Homes, Inc., (Villa Monte Homes) and G & M Management Corporation (G & M). Also set out as defendants were John Doe, Individually, and The John Doe Corporation, but these two entities have no material relevance to this appeal.

A default judgment was entered against Morrison J. Simms and Associates, P. C., and G & M. G & M moved to set aside the default and its motion was subsequently granted on June 12, 1981. After extensive discovery, the cause came on for trial before a jury on June 14, 1982. During the course of the trial, defendant National Homes moved for and was granted a directed verdict in its favor. Motions by the other defendants were denied. The trial of the case resulted in a jury verdict in favor of the plaintiffs and against Atlanta Housing, Villa Monte Homes and G & M — $400,000 for wrongful death of the children and $100,000 for their pain and suffering. Defendant National Homes Construction was not included in the verdict.

After the denial of their motions for new trial and motions for judgment notwithstanding the verdict, the losing defendants have appealed to this court: Atlanta Housing in Appeal 67078; Villa Monte Homes and G & M in Appeal 67079. *Held*:

Each of the defendants against whom damages were found argues that, as a matter of law, the evidence was insufficient to authorize the verdict rendered.

### Facts of the Incident

The following evidence was adduced concerning the events of August 29, 1979. First, the scene of the tragedy was a storm sewer which was located on or near the boundary between the land comprising the Villa Monte apartment project and a parcel of property owned by the Atlanta Housing. The storm sewer was described as consisting of a concrete drainage flume which received surface water from outlet pipes for the upstream drainage area and conveyed such water to a brick headwall which housed the entrance to a 48-inch inlet pipe leading underground into the city's main sewerage system. Thus, the design entailed water flowing from surrounding property via outlet pipes into the flume and thence into the 48-inch inlet pipe. The flume was crossed by a wooden foot bridge by which residents of the Villa Monte apartments could traverse on their way to a playground which was adjacent to the complex.

The mother of the deceased children testified that she had to go to work on the morning of the fatal day; that she left the children instructions to stay in the house but they could go outside "as long as they didn't get in a fight." She stated that she asked her next-door neighbor to "check" on the children. During the early afternoon a violent rainstorm occurred. As a result of the rainstorm, either because the quantity of water was so great or because of a blockage at the entrance or within the system, a deep pond was formed with a rapid current flowing into the pipe at the headwall. The older sister of the two decedents, Angela Gardner, (age 10 at that time) testified that she was charged with looking out for her two sisters and a younger brother. The two girls were at the playground when a dog chased Yvonne who ran into the water at the edge of the storm sewer and then continued into the deep part. Her sister, Lisa, tried to save her and both girls were unable to get out. In an effort to aid them, Angela pushed a door which was lying nearby into the water but was unable to effect a rescue. An occupant of a nearby apartment heard Angela's cries for help and attempted to save the two sisters by wading into the impounded water but the force was too strong and he was barely able to save himself. The witness recalled that there were two doors in the water at the time.

The two sisters were swept under and drowned. Later, after the

waters subsided, their bodies were recovered — one was found on the bank near the headwall, the other inside the inlet pipe.

## Principles of Law

The essential elements of negligence are set out in *Lee St. Auto Sales v. Warren*, 102 Ga. App. 345 (1) (116 SE2d 243): "(1) A legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and, (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty." Accord *Bradley Center v. Wessner*, 250 Ga. 199, 200 (296 SE2d 693). Stated in a more informal way we find language in Judge Smith's dissent in *McAuley v. Wills*, 251 Ga. 3, 9 (303 SE2d 258) wherein he quotes Professor Leon Green who analyzed a negligence case by reference to four steps, to wit: " '(1) Did defendant's conduct contribute to the victim's injury (the causal relation issue)? (2) Was the victim protected under the law against the defendant's conduct with respect to the injury inflicted on him (the duty issue)? (3) Did defendant violate his duty under the law with respect to the victim's injury (the negligence issue)? (4) What is the evaluation in money of the losses suffered by the victim as a result of his injury (the damage issue)?' "

Again referring to Professor Green, 60 Mich. L. Rev. 543, 548-9 the following language is pertinent: " 'Conduct is a factual concept; the victim's hurt is a factual concept; causal relation is a factual concept.' "

The first question that naturally arises is: Was a defendant guilty of a negligent act and was it the actual cause of injury to the plaintiff (or in this case the plaintiffs' deceased children). "Negligence . . . has been defined as conduct which falls below a standard established by the law for the protection of others against unreasonable risk of harm." Prosser, Law of Torts (4th ed.), p. 146, § 31. In a case of this sort the conduct of the defendants must be identified and then a determination must be made as to whether such conduct did involve unreasonable risk to others. Of course, in such cases except in plain and palpable circumstances this determination is for the jury.

Unless a particular act has been declared by statute to be negligent, whether an act constitutes negligence is for the jury to decide. *Eidson v. Mathews*, 120 Ga. App. 711, 712 (1) (172 SE2d 144); *Bussey v. Dawson*, 224 Ga. 191, 193 (160 SE2d 834). As stated in *Garrett v. Royal Bros. Co.*, 225 Ga. 533, 535 (170 SE2d 294): " 'Questions of negligence are ordinarily peculiarly within the jury's province unless the evidence is so plain, palpable and undisputable that a court can conclude that the facts show negligence as a matter of law' . . ."

Concurrent with such problem is the issue as to whether the alleged negligent act resulted in the injury complained of. For, there must be a causal connection between the act or omission relied upon as being negligent and the injury inflicted. The test normally applied is the "sine qua non" or "but for" rule which may be described by the postulate — but for the defendant's act or omission the consequence in question would not have occurred.

"[W]hen an injury can be traced directly to a wrongful act, and but for such wrongful act it could not reasonably be supposed that the injury would have resulted, this essentially antecedent act may be said to be the 'proximate cause' of the injury." *Gregory v. Ross*, 214 Ga. 306, 311 (104 SE2d 452). In *Southern R. Co. v. Daughdrill*, 11 Ga. App. 603, 609 (75 SE 925) this court held: "when an injury can be traced directly to the tortious act (though there be several paths in the track which lead back to this act), and but for this tortious act it could not reasonably be supposed that the injury would have resulted, this essentially antecedent act may be said to be the proximate cause of the injury." Stated another way: "No matter how negligent a party may be, if his act stands in no causal relation to the injury it is not actionable." *McKinney v. Burke*, 108 Ga. App. 501 (2) (133 SE2d 383). Accord *Western & Atlantic R. v. Frazier*, 66 Ga. App. 275 (2) (18 SE2d 45).

In this case the direct cause of the children's death was drowning resulting from the ponding of a large quantity of swiftly flowing water. Did an act or omission on the part of one or all of the defendants reasonably contribute, wholly or partly, to the situation in which the children died? The ponding of the water could have resulted from an affirmative act by which such condition was created, such as — constructing and maintaining an inadequate or deficient sewer system or by actually placing trash and debris in the pipe so that it clogged; or it could have resulted from a negligent failure to remedy the condition, such as — permitting a stoppage to occur by not inspecting and cleaning out the inlet pipe.

As indicated the question of what duty a defendant owed a plaintiff is a crucial issue. "This is a policy problem — a matter of law." Green, p. 563. One of the problems arising out of the question of duty is the parties' status and their relation to each other. Without question a landowner owes a duty of care to one injured on his land and the degree of care rests on the status of the injured party — invitee, licensee or trespasser.

"In the case of a trespasser 'liability arises only where the injury has been occasioned by the wilful and wanton negligence of the proprietor or owner. No duty of anticipating his presence is imposed; . . . the duty to use ordinary care to avoid injuring him after his presence and danger is actually known is, in point of fact, merely the duty not

to injure him wantonly or wilfully.' . . . In the case of a licensee 'there is a slightly higher duty on the part of the owner or proprietor of the premises. He must not wantonly and wilfully injure the licensee; *and since his presence as a result of his license is at all times probable, some care must be taken to anticipate his presence, and ordinary care and diligence must be used to prevent injuring him after his presence is known or reasonably should be anticipated* [italic ours]. The fundamental concept in this class of cases, as in that of trespassers, is of a liability only for wilful or wanton injury; but it is usually wilful or wanton not to exercise ordinary care to prevent injuring a person who is actually known to be, or reasonably is expected to be, within the range of a dangerous act being done.' " *Petree v. Davison-Paxon-Stokes Co.*, 30 Ga. App. 490, 493 (118 SE 697). Accord *Central of Ga. R. Co. v. Ledbetter*, 46 Ga. App. 500, 503 (168 SE 81); *Banks v. Watts*, 75 Ga. App. 769, 772 (44 SE2d 510). As to invitees, the owner of land is liable for injuries occasioned by his failure to exercise ordinary care in keeping the premises and approaches safe. OCGA § 51-3-1; *Mandeville Mills v. Dale*, 2 Ga. App. 607, 610 (58 SE 1060).

"In determining the status of a person, that is to say, whether he was an invitee, a licensee or a trespasser, neither his age nor his capacity, mental or physical, is a factor for consideration." *Crosby v. Savannah Elec. &c. Co.*, 114 Ga. App. 193, 196 (150 SE2d 563). Accord *Blair v. Manderson*, 126 Ga. App. 235, 236 (190 SE2d 584).

"A greater quantum of care, though not a greater degree of care, may be necessary where a child of tender years is involved and a dangerous thing exists on the premises." *Higginbotham v. Winborn*, 135 Ga. App. 753, 756 (218 SE2d 917). As pointed out in *Petree v. Davison-Paxon-Stokes Co.*, 30 Ga. App. 490, 494, supra, "Indeed, we can conceive that the owner of lands on which a dangerous thing exists may be in legal duty bound to use a greater quantum of precaution in behalf of an infant licensee thereon than he would in behalf of an adult invited guest. The sum of the whole matter is included in the expression frequently enunciated that 'duties arise out of circumstances.' "

Counsel for the plaintiffs argue an additional basis for finding an obligation or duty besides that owed by one occupying the status of a landowner, which is — one in "control of the property." Succinctly stated, according to counsel's contention, liability is dependent on whether an alleged tortfeasor had any duty which might arise from " 'control of the property, whether or not he has title thereto and whether or not he has a superior right to possession of property which is in the possession or control of another.' " *Scheer v. Cliatt*, 133 Ga. App. 702 (2a), 704 (212 SE2d 29). Accord *Daniel v. Ga. Power Co.*, 146 Ga. App. 596, 597 (2) (247 SE2d 139).

### General Facts

Two of the principal questions emanating from the trial were: 1) what was the cause of the storm sewer's flooding, 2) who was in control of the storm sewer and responsible for its maintenance?

As to the first question, several theories were advanced but primarily the two basic causes, according to opinions given by the witnesses, both expert and lay, were clogging of the pipe at or beyond the headwall and design of the sewer which was inadequate to handle the torrential rainstorm that occurred on August 29, 1979. There was testimony, including that of the individual who attempted to rescue the two girls, that the waters dissipated a very short time after the incident and there was no trash in the sewer remaining. Based on the rapidity with which the flooding subsided one of the witnesses opined that the magnitude of the downpour was the cause of the ponding and that because of the unusual amount of rain the system was unable to accommodate the vast quantity of water. The failure of the system, therefore, could either be attributable to defective designing of the storm sewer or rain in such quantity that no system could effectively handle it (*vis major*).

Nevertheless, there was considerable evidence and expert testimony that the system was clogged. According to testimony of expert witnesses the obstruction necessary to cause the waters to back up could have occurred at the opening of the 48-inch inlet pipe or downstream at any point. It appeared that on the day after the incident maintenance employees from Villa Monte Homes removed a large quantity of debris from the inlet pipe and that Atlanta Housing hauled it away. The usable portion of the opening was described as being "maybe a foot or six inches."

There was disagreement as to the reasonableness and feasibility of the storm sewer's location and its design which was "open." One expert witness designated the placement of the sewer close to the playground as an "imminently dangerous situation" and stated that the system should have been enclosed since the open flume sewer was a "poor design choice." Another witness found the location and the design completely acceptable ("a very typical design") and stated that a closed system would be costly and unacceptable. He also testified the design was capable of handling more than a "fifty year" flood when unobstructed and stated there had been no such event within the time frame involved. We note that there was considerable testimony concerning the absence of a grate at the opening of the headwall. This will be covered in more detail later in our examination of the facts.

We observe that one witness stated that Atlanta Housing constructed the headwall and inlet pipe while the concrete flume or swale

was built by National Homes Construction. Nevertheless, there was contrary testimony as well as documentary evidence that the entire storm sewer was built by National Homes Construction. Thus, although this fact was not undisputed, it clearly appears well founded that National Homes Construction was responsible for building the storm sewer. We also observe that both the design and location of the storm sewer had been approved by HUD. Because of these facts it is therefore reasonable to surmise that the jury's decision was evidently that the first theory — i.e., clogging — was the cause rather than defective design or construction since the party who constructed the sewer, National Homes Construction, was assessed no damages.

A question as to cause also brings into focus the important issue of negligent causation. For even if the ponding was caused by an obstruction or clogging of the storm sewer, still a defendant would not be negligent unless he owed a duty to the children and his acts contributed to or resulted directly in creating the condition which caused the children's death. This leads naturally to the second question which involves who was responsible for the upkeep and maintenance of the sewer and thus who would have been negligent in failing to properly maintain it. This determination rests on who was the owner of the property that was the site of the storm sewer and most particularly who had legal control of such premises. Because the ownership and control of the property where the drownings occurred was of vital importance, a review of the evidence as to this issue is now indicated. The facts, while not undisputed, are basically as follows: The components of the storm sewer lay in close proximity to the boundary line between two tracts of land — the larger of which comprised the Villa Monte complex and the smaller of which was owned by Atlanta Housing. The two parcels of land, encompassing the storm sewer, were part of a very large tract originally owned by the Federal Government. Subsequently Atlanta Housing acquired the tract for redevelopment purposes. Pursuant to the redevelopment program the property was offered for sale by means of proposals which contained plans and specifications as to how the land would be redeveled. Upon approval of its proposal National Homes acquired the property now comprising Villa Monte from Atlanta Housing. This interest was then transferred to National Homes Construction which accomplished the construction of the Villa Monte project. Thereafter, Villa Monte Homes, which was a cooperative association, became the owner with G & M, under an agreement to that effect, providing all management services for Villa Monte Homes including bookkeeping, housekeeping, maintenance, etc. The smaller parcel of property was not transferred but title remained in Atlanta Housing. It should be observed that National Homes had what was apparently a construction easement or right of entry to the Atlanta Housing land in that such parcel could

be used by National Homes for storage and as aid to construction until the project was completed. Also, the transfer from the Atlanta Housing to National Homes of the Villa Monte land contained a provision that a certificate of completion had to be issued and filed with the warranty deed, otherwise the property could revert to the Atlanta Housing. During the course of the trial, evidence was introduced indicating that although HUD apparently did issue a letter of completion Atlanta Housing had not. Thus, while as a practical matter all construction had ceased, the project was not officially "completed."

Again there are discrepancies and conflicts in the evidence, however, from testimony, surveys, plats, drawings and other documentary evidence it may be stated with some certainty that at the time of the tragic event which precipitated this law suit, the drainage system and the upper part of the concrete swale or flume which comprised a portion of the storm sewer lay on Villa Monte property while the remainder of the flume as well as the headwall and inlet pipe opening were on property of the Housing Authority.

Who was responsible for maintaining the storm sewer? In this regard Atlanta Housing had granted, as to the parcel it owned, a right of entry or construction easement to National Homes at the same time National Homes acquired the Villa Monte tract and began to make improvements therein. Furthermore, Atlanta Housing had not issued a certificate of completion regarding the Villa Monte complex and thus did not consider that such right had terminated. The proof adduced insofar as Atlanta Housing's activities were concerned showed that it made no effort to maintain, or to inspect on a regular basis, the storm sewer. The prevailing view was that it was someone else's responsibility as long as there was a construction easement on the land. While officials of Atlanta Housing did not consider the entire project complete there was no question that construction of the storm sewer itself was complete.

There was evidence that once prior to Aug. 29, 1979, after several efforts by Miller, the president of G & M, to get Atlanta Housing to clear up its various unoccupied or vacant parcels, through the intercession of a TV reporter Atlanta Housing did send someone out to cut the grass. The only other evidence of Atlanta Housing taking any steps towards upkeep or maintenance involved the day after the children's death when, after employees of Villa Monte and G & M cleaned out the debris from the inlet pipe, employees of Atlanta Housing apparently hauled the trash away.

An official of Atlanta Housing admitted it had no procedure for routinely inspecting storm sewers or land it owned or managed. Furthermore, Atlanta Housing had no regular maintenance plan as to drainage for any of its properties. That same official denied any prior knowledge regarding the storm sewer backing up or ponding.

With regard to Villa Monte Homes and G & M, it appeared from testimony that its employees were instructed to cut grass in the vicinity of the storm sewer and to provide upkeep for that area. This included cleaning out the storm drain by going inside the pipe with shovels and physically removing accumulated debris. The evidence indicated that there was confusion as to whether the property in question belonged to the Villa Monte parcel. Nevertheless, according to G & M's president, the maintenance and cleaning was primarily performed because no one else would do it and the purpose was to insure the tidy appearance of the open spaces around the complex. Reference was made to the constant problems which resulted when vacant areas adjacent to the complex were permitted to "grow up" and were not trimmed or otherwise maintained by their actual owners. There was no evidence that Villa Monte or G & M entered into any agreement or had any contractual liability as to the upkeep of the tract owned by Atlanta Housing.

During the course of the trial a prior incident at the storm sewer was related. Apparently, when water was pouring into the drain but at no such level as obtained on Aug. 29, 1979, several children were playing there, sliding down the flume. One of the children either slid or fell into the inlet pipe at the headwall and was carried down the pipe for some distance where he managed to grab on to a portion of a drain cover. He was rescued when a Villa Monte employee removed the cover and pulled him out. Officers of Atlanta Housing denied any knowledge of this incident and so did the executives of G & M and Villa Monte, but some of the employees and supervisory officials of those two concerns were familiar with the occurrence.

It was also brought out that the location had flooded prior to the August 29th incident and that it also flooded subsequently thereto.

This leads to one of the focal points of the trial, to wit — the presence or absence of a grate at the opening of the inlet pipe. According to testimony and documentary evidence, in 1974 several officials of HUD, the City of Atlanta, National Homes and Atlanta Housing, as well as an engineer and architect met to discuss various problems regarding the project and issued the following directive: "A headwall with a 48″ inlet was installed at the end of the concrete swale south of the project boundary. No provision was made for a protective type of closure (i.e. grate or bars) over the inlet opening. It was concluded that a very serious hazardous condition was caused by this inlet opening (i.e. children playing in adjacent play area could fall in the opening) and National Homes agreed to correct the situation immediately (Mike Bolka [an officer of National Homes] said they would start 1-19-74)."

An official of Atlanta Housing testified the grate was affixed. However, some time thereafter and prior to August 29, 1979, the grate

was removed or otherwise disappeared. There was testimony that there were some spots which indicated something had been welded to the headwall. Nevertheless, Villa Monte and G & M began managing the complex in 1977 and none of their employees remembered seeing a grate there. The day following the August 29, 1979, deaths of the children, after making several unsuccessful efforts to get Atlanta Housing to put up a grate, the president of G & M directed his subordinates to have a grate installed by an independent contractor. This was accomplished at a cost of $92.

One of the expert witnesses testified that ordinarily grates are not placed over the openings of inlet pipes since they tend to cause trash and other debris to accumulate and therefore produce stoppages and flooding. There was also testimony that the purpose of a grate was not to prevent accumulation of material which would clog the drain but to prevent small children, or anyone for that matter, from falling into or going into the inlet pipe from whence one might become entrapped or swept further into the sewer system by force of water.

Having discussed generally the salient facts and law involved in these appeals, we now consider each of the defendants predicated on their relationship vis-a-vis the deceased children.

### Villa Monte Homes and G & M (67079)

In view of their status and concomitant functions, Villa Monte Homes and G & M may be treated essentially as one entity. Therefore, we now determine whether a verdict against these two defendants was authorized, tested by the applicable legal maxims, especially those previously examined.

The allegations of negligence against these two defendants read as follows: "(a) Defective and dangerous design of the subject storm sewer; (b) Dangerously defective construction of the subject storm sewer; (c) Failure to warn of dangers associated with the storm sewer, which dangers were well known to the defendant; (d) Failure to take action to correct the dangers associated with the storm sewer; (e) Location of a children's playground in dangerous proximity to the subject storm sewer; (f) Failure to maintain the area surrounding the storm sewer so to assure proper and safe operation; (g) Failure to provide safety mechanisms to prevent entrance of individuals into the storm sewer; (h) Other particulars as will be demonstrated at the time of trial."

It was also alleged: "The defendants Atlanta Housing Authority, Villa Monte Homes, Inc. and G & M Management Corporation knew, or should have known, of the dangerous condition of the subject sewer, were on notice of the risk involved, and either knew or should have known that young children would not appreciate the danger.

Moreover, these defendants, while under a duty to do so, failed to exercise ordinary care to make the sewer safe, and further failed to exercise ordinary care to warn others of the dangers attendant to the storm sewer."

1. The evidence adduced at trial established beyond peradventure that neither of these two defendants were negligent under allegations (a), (b) or (e) since they were not involved with the design or construction of the sewer nor with the location of the playground. Moreover, as has been previously noted the parties who were involved with construction either obtained a motion for directed verdict (National Homes) or were found not liable for damages by the jury (National Homes Construction).

2. We reach the remaining grounds of negligence which raise the difficult question (in addition to negligence and causation) of the duty owed.

It must be kept in mind that: "There is no liability from ownership alone . . . It must appear that the injury resulted from a breach of some duty owed by the defendant to the injured party." *Slaughter v. Slaughter*, 122 Ga. App. 374, 376 (177 SE2d 119). Synthesizing, there are three basic theories under which the two defendants could be found to owe the plaintiffs a duty with regard to the condition of the headwall/inlet pipe: 1) due to their status as owners and occupiers of land to exercise care to keep the approaches safe, 2) due to their right to control, possess and utilize the land on which the headwall/inlet pipe were situated, 3) due to their voluntary assumption of the maintenance and upkeep of the headwall/inlet pipe for which they would be responsible for negligent performance.

(a) The first two theories are sufficiently interrelated so as to be discussed together.

While there was some conflict and indecision as to the exact location of the headwall, the evidence demands a finding that the headwall and opening for the inlet pipe lay on Atlanta Housing's land. This is also conceded by all parties. However, plaintiffs contend that the evidence contains sufficient indicia that Villa Monte and G & M exercised control over the storm sewer so as to impose a landowner's duty upon them relative to the plaintiffs' decedents.

A closer examination of the two cases cited by plaintiffs' attorneys reveal that the word "control" has a specific meaning rather than the general one contended for by plaintiffs.

*Scheer v. Cliatt*, 133 Ga. App. 702, supra, pertained to the grant of defendant's motion for summary judgment and was decided based on principles applicable thereto. In that case, it was alleged that the plaintiff slipped and fell on a sidewalk abutting the defendant's premises; that the plaintiff was walking on an "approach" to the defendant's barber shop when she stepped on a slippery substance.

There was proof offered that an alleged employee of the defendant attempted to clean a spill on the sidewalk and had left a thin film of soap on the sidewalk. It was also sought to be shown that defendant was the owner or occupier of the premises since he was the owner or operator of the barber shop located thereon.

The theories of recovery against the defendant were based on a duty as owner or occupier to exercise ordinary care to keep the premises and approaches safe; the duty of a master for acts of a servant who created or maintained the thing from which the injury resulted; the duty of a master of a servant who was negligent in performing a clean up after having undertaken to do so.

This court, after recognizing the defendant had the burden of showing conclusively that the plaintiff had no right to recover under any theory fairly drawn under the pleadings and evidence, found a question remained as to whether the defendant was the "owner or occupier" of the barber shop. That question was found to turn on whether or not the defendant had " 'control of the property, whether or not he has title thereto and whether or not he has a superior right to possession of property which is in the possession or control of another.' " *Scheer v. Cliatt*, 133 Ga. App. 702, 704, supra. This court pointed out several factors to be considered as evidence of control such as maintenance and repair of the premises. The court then concluded " '[w]hether a particular appurtenance or instrumentality is under the control of an owner or occupant is usually a question of fact.' " Id. at 704.

The issue in the *Scheer v. Cliatt* case was clearly predicated on what is now OCGA § 51-3-1 — the duty of an owner or occupier to keep the premises and approaches safe. In *Elmore of Embry Hills v. Porcher*, 124 Ga. App. 418, 420 (183 SE2d 923) this court defined approaches as "the sidewalk or other approach that is directly contiguous, adjacent to, and touching the premises under control of the owner or occupier." As pointed out in *Bailey v. Wohl Shoe Co.*, 128 Ga. App. 372, 373 (196 SE2d 677): "Generally, the owner of property abutting a public sidewalk in a municipality, is not liable to a member of the public for injuries resulting from a defect in such sidewalk which was not caused or created by the abutting owner, as the law places upon the municipality the duty of keeping the sidewalks safe for travel in the ordinary manner."

An examination of an earlier case clearly emphasizes the point that "control" as the term is used in *Scheer v. Cliatt*, 133 Ga. App. 702, supra, is control based on a legal right or duty with regard to an approach or approaches. In *Belk-Matthews Co. v. Thompson*, 94 Ga. App. 331 (1) (94 SE2d 516) is the language: "An owner or occupant of abutting premises who has a servitude in the sidewalk for his private benefit, the enjoyment of which involves the disturbance of the sur-

face of the walk or otherwise affects its safety, must exercise due care to maintain in safe condition the portion affected by such servitude and will be liable for injuries proximately resulting from default in this respect." The case further elucidates on this by proclaiming: " 'While the owner [or occupant] of abutting property is not liable for defects in the street or sidewalk merely by reason of his ownership of the property, nevertheless, where the owner [or occupant] of abutting property causes or contributes to the erection of an obstruction or a defect in the street or sidewalk, he will be liable to one injured thereby, not because of his ownership [or occupancy] of the property, but because of his negligent acts or omissions in creating the defect or hazard.' " Id. at 338. Accord *Reed v. Batson-Cook Co.*, 122 Ga. App. 803, 805 (178 SE2d 728).

*Spindel v. Gulf Oil Corp.*, 100 Ga. App. 323, 326 (111 SE2d 160) contains the language: "Code § 105-401, which places on the owner or occupier of land the duty to keep his premises and approaches safe for invitees, refers to premises under the control of the owner or occupier, not to premises over which he has a mere easement of passage, and which belong to another."

The other case advanced as support for plaintiffs' theory is *Daniel v. Ga. Power Co.*, 146 Ga. App. 596, supra, which also involved the grant of a summary judgment for the defendant who owned the property on which plaintiff was injured. This court affirmed because another defendant was found to be in actual and absolute control of the nature trail where the plaintiff was injured. Furthermore, the actual control of the other defendant was based on a legal right in that it exercised "all and every dominion over the same as an owner."

A better expression of the relevant principles is contained in *Williams v. Nico Indus.*, 157 Ga. App. 814 (278 SE2d 677) [overruled in part on other grounds in *Malvarez v. Ga. Power Co.*, 250 Ga. 568, 569 (300 SE2d 145)], wherein a general contractor in charge of renovation of an apartment building was among those sued. That case explained *Daniel v. Ga. Power Co.*, 146 Ga. App. 596, supra, as follows: "The liability of an owner of property, if any, is dependent on whether said owner had any duty which might arise from control of the property or title thereto or a superior right to possession of property which is in possession or control of another." *Williams*, 157 Ga. App. 814, 817, supra.

Control as used by the cases equates with a right to possess or exercise dominion over another's property, not the mere act of providing upkeep thereon. Otherwise, if one neighbor periodically but voluntarily cuts part of another neighbor's lawn he might be found in control of that portion of the other's yard for a period of time other than when he was actually performing upkeep. Instead, such party is not liable for a defective or dangerous condition on the land unless he

was actually negligent by creating, causing or contributing to the dangerous situation.

Neither *Scheer v. Cliatt*, 133 Ga. App. 702, supra, nor *Daniel v. Ga. Power Co.*, 146 Ga. App. 596, supra, stand for the proposition that the control referred to can arise outside of a legal right or from merely volunteering to go on another's land and performing certain services such as repairs or upkeep. In order for there to be a duty arising from control of land at a time when one is not physically on the premises, there must be the grant of authority, dominion or a continuing exclusive right to control the premises in question. In short, one must have the status of an occupier, such as a contractor who comes upon another's land for the purpose of constructing a house or building.

By way of summary, the defendants were under no duty to plaintiffs merely because they might be owners or occupiers of land adjacent to the premises wherein lay the apparent cause of the fatal mishap. While adjacent land that comprised an approach to the lands of a defendant may under the proper circumstances form the basis for a statutory duty (OCGA § 51-3-1), it is clear that the headwall with its inlet pipe did not constitute an approach to defendant's land over which the defendants had any responsibility.

Regarding a duty predicated on control of the premises, we find the elements on which to base such duty to be lacking. In essence, there was no showing as to any type of arrangement which would indicate that either of the two defendants were occupiers, and thus in control, of the land owned by Atlanta Housing. Moreover, it is evident that there was no contractual arrangement between these two defendants and Atlanta Housing whereby they were to maintain and repair the headwall and inlet pipe.

Finally, whether the work on such land was accomplished because of a mistake as to who owned it or because it was deemed necessary by the president of G & M to keep up the appearance of the area and to avoid unsightly conditions, the yard work or upkeep was not carried out because of any control that the two defendants had over the land where the headwall/inlet pipe were located. Thus, under a control theory there was no basis for their liability at any time other than when they were physically present on the property.

(b) The only other evidence regarding control and negligence with regard thereto involves the subsequent installation of a grate at the inlet pipe.

The fact that a grate was subsequently installed on Atlanta Housing's property on the orders of the president of G & M does not establish control. There is nothing to show this after-the-fact action was taken other than predicated on a moral responsibility. There is no evidence that the two defendants were authorized, empowered or

even directed to place the grate on the headwall so as to cover the inlet opening prior to the occurrence. We have already found they had no duty to do so. The action taken subsequently was based primarily on the inaction by Atlanta Housing.

Moreover, regardless of whether it was negligent not to install (or replace) a grate at the headwall opening and regardless of whether these two defendants were under a duty to do so, there is no basis for recovery on this ground. The evidence conclusively established that the absence of a grate was not the cause of the children's deaths. The conditions were such that the drownings would have occurred even if a grate had been installed. It should be emphasized that an obstruction could clog the pipe whether it was inside the pipe or at its mouth. Besides testimony to that effect, this is evident from a picture portraying an obstruction that had occurred a considerable time after installation of the grate. It depicted debris lying against the grate leaving only a small aperture at the top of the pipe. "If an injury would have occurred notwithstanding the alleged acts of negligence on the part of the defendant, there could be no recovery . . ." *Western & Atlantic R. v. Frazier*, 66 Ga. App. 275 (2), supra.

As stated in *Patillo v. Thompson*, 106 Ga. App. 808, 811 (4) (128 SE2d 656): " 'Actionable negligence involves, first, the existence of a duty; second, the omission to exercise ordinary and reasonable care in connection therewith; and third, injury resulting in consequence thereof.' " For, regardless of the degree of negligence, it is not actionable unless there is a causal relation to the injury. *McKinney v. Burke*, 108 Ga. App. 501, supra.

Here, the presence of a grate might have prevented one from being swept into the inlet pipe but would not forestall a drowning resulting from waters accumulating and ponding in such depth as to cover the pipe itself.

3. Having reached the conclusion that the two defendants had no duty arising out of the ownership of land and its approaches and no duty as a result of control exercised over the land owned by Atlanta Housing, we reach the conclusion that with regard to the activities in question, that the two defendants through their employees were acting solely as volunteers. Therefore, a determination of a volunteer's duty to third persons must be made.

(a) Traditionally the law regarding volunteers has revolved about the early distinction made between misfeasance and nonfeasance, that is — "between active misconduct working positive injury to others, and passive inaction, or a failure to take steps to protect them from harm." Smith & Prosser, Cases and Materials on Torts, p. 320 (1952). The tendency has been to move from that view and to impose responsibility regardless of whether the negligent conduct constituted misfeasance or nonfeasance or as pointed out by Justice Felton in his

dissent in *Mull v. Aetna Cas. &c. Co.*, 226 Ga. 462, 464 (175 SE2d 552): " '[I]t has come to be a recognized principle that liability can arise from the negligent performance of a voluntary undertaking . . . "It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." ' " Justice Felton further noted: " 'One who gratuitously renders services to another . . . is subject to liability for bodily harm caused to the other by his failure, while so doing, to exercise with reasonable care such competence and skill as he possesses.' . . . 'The language that a volunteer is liable for failure to use such competence and skill as he possesses does not admit to a conclusion that the only duty of the volunteer is to refrain from positive acts of negligence . . .' '[N]egligence consists either of the omission to do an act which ought to be done, or the omission to perform properly what one undertakes to do.' " As recited in 57 AmJur2d 392, Negligence, § 45: "[t]he law imposes an obligation upon everyone who attempts to do anything, even gratuitously, for another, to exercise some degree of care and skill in the performance of what he has undertaken, for nonperformance of which an action lies."

The end result is that the Georgia Supreme Court has adopted the majority rule contained in Restatement, Torts (2d) § 324A. *Huggins v. Aetna Cas. &c. Co.*, 245 Ga. 248 (264 SE2d 191). This provision reads " 'Liability to Third Person for Negligent Performance of Undertaking. One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.' "

Assuming that there might be evidence of one of the three bases found in § 324A, still the primordial ingredient of this rule is liability resulting from failure to exercise reasonable care.

There is not an iota of direct evidence tending to show any negligent acts by the defendants through their servants/employees. Instead all the evidence indicates that the work was carried out with normal or ordinary care and due diligence. Basically, the only evidence which lends itself to the possibility of negligence arises from the circumstances and more precisely from the fact that the inlet pipe was clogged by debris, leaving only a foot or less of clearance.

The mere fact of injury or damage does not give rise to a presumption or inference of negligence since " '[n]egligence is not to be presumed, but is a matter for affirmative proof.' " *Worth v. Orkin Ex-*

*terminating Co.,* 142 Ga. App. 59, 62 (234 SE2d 802). Accord *Chenall v. Palmer Brick Co.,* 117 Ga. 106, 108 (43 SE 443). Moreover, "[i]n the absence of affirmative proof of negligence, we must presume performance of duty and freedom from negligence." *Orkin Exterminating Co. v. Stevens,* 130 Ga. App. 363, 368 (203 SE2d 587). Accord *Beadles v. Bowen,* 106 Ga. App. 34, 37 (126 SE2d 254).

(b) Since the sole circumstance from which negligence might be inferred was the clogged condition of the inlet pipe, the doctrine of res ipsa loquitur provides the remaining theory on which to predicate improper performance of a voluntarily assumed task.

The Supreme Court has discussed this maxim as follows: "The expression 'res ipsa loquitur' means that the transaction speaks for itself. It is a rule of evidence which allows an inference of negligence to arise from the happening of an event causing an injury to another where it is shown that 'the defendant owned, operated, and maintained, or controlled and was responsible for the management and maintenance of the thing doing the damage,' and 'the accident was a kind which, in the absence of proof of some external cause, does not ordinarily happen without negligence.' *Chenall v. Palmer Brick Co.,* 117 Ga. 106, 109 [supra]. The rule is one of necessity in cases where there is no evidence of consequence showing negligence on the part of the defendant." *Parker v. Dailey,* 226 Ga. 643, 645 (177 SE2d 44). Accord *Hall v. Chastain,* 246 Ga. 782 (273 SE2d 12).

This court has criticized the doctrine of "exclusive control" in *Smith v. Telecable of Columbus,* 142 Ga. App. 535, 536 (236 SE2d 523) and expounded the requirement that the "evidence must afford a rational basis for concluding that the cause of the accident was probably 'such that the defendant would be responsible for any negligence connected with it.' " Accord *Sams v. Gay,* 161 Ga. App. 31, 33 (2) (288 SE2d 822). Nevertheless, the Supreme Court has not yet adopted this test but has remained with the classical requirements that there must be either ownership, operation and maintenance or control and responsibility for management and maintenance. *Parker v. Dailey,* 226 Ga. 643, 645, supra. The accident must also be "of a kind which, in the absence of proof of some external cause, does not ordinarily happen without negligence." *Chenall v. Palmer Brick Co.,* 117 Ga. 106, 109, supra. Accord *Minkovitz v. Fine,* 67 Ga. App. 176 (2) (19 SE2d 561). In the case sub judice we have already determined the defendants neither owned nor controlled the land in question. Moreover, any upkeep performed was on a voluntary basis. Whether applying the test set forth in *Smith,* 142 Ga. App. 535, supra, or the more traditional one predicated on ownership or control, we are not prepared to hold that where one gratuitously performs maintenance and upkeep on land he neither owns nor controls he is presumed to be negligent merely because of the existence of a non-permanent condi-

tion thereon. Before res ipsa loquitur is applicable, the act must speak not only of negligence, but of negligence on the part of the defendant. *Fender v. Colonial Stores*, 138 Ga. App. 31, 38 (225 SE2d 691). "[R]es ipsa loquitur should be applied with caution and only in extreme cases; . . . it is not applicable when there is an intermediary cause which produced or *could* produce the injury, or where there is direct unambiguous testimony as to the absence of negligence by the defendant, or where there is no fair inference that the defendant was negligent." *Hosp. Auth. of St. Marys v. Eason*, 222 Ga. 536, 541 (150 SE2d 812). Accord *Fox v. Cohen*, 160 Ga. App. 270, 271 (287 SE2d 272). In brief, the doctrine of res ipsa loquitur could not be applied to these defendants under the circumstances here.

In conclusion, there is no evidence of overt or even passive negligence by the defendants. The only evidence from which negligence may be inferred is a clogged inlet pipe located on the land of another. Although under no requirement to do so, the defendants did provide upkeep in the vicinity of the inlet pipe and had on occasions acted to clean out such pipe. This is an insufficient basis on which to apply the doctrine of res ipsa loquitur. Since negligence on defendants' part was not proven and cannot be presumed from the mere happening of an event the evidence did not authorize the verdict rendered against these two defendants.

It was error to overrule their motions for judgments n.o.v. predicated on their motions for directed verdict.

In view of this ruling the remaining enumerations of error of these two defendants need not be passed upon.

### Atlanta Housing (67078)

4. (a) We next consider Atlanta Housing's argument that the evidence did not sustain a verdict against it.

There was no evidence which would justify a finding that the two children were invitees of Atlanta Housing. See *Abney v. London Iron &c. Co.*, 152 Ga. App. 238 (1) (262 SE2d 505). Instead, they would appear to be either licensees (see *Epps v. Chattahoochee Brick Co.*, 140 Ga. App. 426 (231 SE2d 443)) or trespassers. See *Montega Corp. v. Grooms*, 128 Ga. App. 333 (196 SE2d 459).

Formerly, being a child was not a factor for consideration in determining one's status as invitee, licensee or trespasser (see the division on Principles of Law), but the blurred distinction between a child's status as a licensee or trespasser has been virtually obliterated by our Supreme Court's adoption of the Second Restatement of Torts, § 339 (1965), which "sets forth five conditions which must be met to sustain a cause of action for trespassing children. '§ 339. Artificial Conditions Highly Dangerous to Trespassing Children — A possessor of land is subject to liability for physical harm to children tres-

passing thereon caused by an artificial condition upon the land if (a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and (b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and (c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and (d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and (e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children.' " *Gregory v. Johnson*, 249 Ga. 151, 154 (289 SE2d 232). Because these conditions are applicable to a child trespasser, certainly a child licensee would be subjected to no stricter standard. Compare *Patterson v. Thomas*, 118 Ga. App. 326, 328 (163 SE2d 331). Thus, as a practical matter, we may test the proof adduced by the five requirements regardless of which category applied to these two children. See Restatement (2d) of Torts, § 343 (1965).

There was evidence adduced at trial sufficient to establish the following: The land on which the headwall and entrance to the inlet pipe were located was owned by Atlanta Housing. The inlet pipe contained debris which was subsequently removed. The debris was of sufficient quantity so that only one foot or less of the opening remained. Clogging of the inlet pipe would definitely cause the waters to accumulate, back up and pond as did occur on the day in question. At one point a witness stated that Atlanta Housing assumed the "drainage facility" was part of Villa Monte and that Villa Monte would take care of it. It was admitted that Atlanta Housing had no procedure for routinely investigating or inspecting storm sewers nor did it have a program or regular maintenance plan for any of its properties. The president of G & M tried unsuccessfully several times to get Atlanta Housing to perform upkeep or maintenance on its land. With one exception, when the grass around the headwall was cut, prior to August 29, 1979, Atlanta Housing did not cut the grass or maintain the property since it was considered the contractor's (who had a right of entry) responsibility. There was no evidence that Atlanta Housing contracted for or bargained away any of its rights or responsibilities although it may have obtained an indemnity agreement.

Atlanta Housing, in conjunction with Villa Monte Homes and G & M, was charged with particular grounds of negligence which we have previously quoted — involving knowledge of a dangerous condition, failure to warn, etc. It was in addition charged with the following acts of negligence: "(a) In maintaining the subject storm sewer in a

dangerously defective and hazardous condition; (b) In failing to take proper steps to eliminate the hazards known to be associated with the storm sewer; (c) Failure to warn of dangers associated with the storm sewer; (d) In other particulars as will be developed at the time of trial."

We have listed three possible reasons as the prime cause of flooding emanating from the headwall/inlet pipe: blockage of the flow of water at or in the pipe, improper design or vis major.

Vis major, which is a basis for finding no negligence on anyone's part, need not be considered since the jury verdict that the defendant was negligent eliminated such principle and the evidence fell short of demanding that the cause was vis major.

A succinct survey of the evidence will enable us to appraise the theory of improper design. An expert witness for plaintiffs stated that "as to the appropriateness of an open flume storm sewer for drainage purposes at a housing project . . . . I think it is a poor design choice." He then explained, from his experience, in any type of housing project, trash and rubbish tend to collect; that water will carry it into the flumes; this gives an "inherent possibility of damming it up, which gives you a lake . . ." The witness answered affirmatively the question: "Do you have an opinion as to whether or not the construction and maintenance of the open flume sewer at the Villa Monte project was dangerous?" To the question "What is your opinion?", the witness responded: "I think it was an imminently dangerous situation in that I felt trash could plug it, create a pond where nonswimmers could get into it."

This witness who visited the site after August 29, 1979, testified that on May 8, 1980, there was some rubbish stopping up the entrance into the 48-inch drain (inlet pipe); that on January 5, 1982, the 48-inch pipe was totally stopped up; the inlet structure was dammed and there was water approximately five feet deep throughout the area. This witness also admitted he had no criticism of the capacity of the storm sewer and that he had no knowledge of an overflow "when there was a lack of any debris in the system." He knew of no code violations but had not calculated the flow requirements. He reiterated his belief that if the water ponded, "it had to have been plugged." The witness further admitted that a blockage far downstream from the opening of the inlet pipe could have caused the ponding. The witness conceded that the main factor in the safety of a system insofar as flooding was concerned was maintenance.

The expert witness for the defendant repeatedly stated that the design was a proper one and more than adequate to handle any except the most extraordinary floods.

We have detailed this evidence to illustrate the only design feature which could be faulted was the system's possible propensity for

becoming obstructed by trash and debris. However, this weakness was true of any system where proper upkeep and maintenance were not performed. There was no testimony of any inherent design defect and indeed even the witness for the plaintiffs stated the unclogged sewer was designed for possibly a 25-year flood while defendant's witness opted for more than a 50-year flood. Therefore, we find as a matter of law the sewer design was not inherently defective or dangerous but required two other elements in order to be considered a dangerous condition: 1) a partial or complete obstruction of the inlet pipe, 2) sufficient quantity of water to flood the area.

This leaves for our consideration of the case the prevailing theory of cause — some type of blockage or clogging of the inlet pipe.

Tested by the five conditions of the Restatement (2d) of Torts as set out in *Gregory v. Johnson*, 249 Ga. 151, 154, supra, we find evidence sufficient to establish four of the five criteria which are briefly listed. Condition (a): Atlanta Housing had reason to know that children were likely to trespass since it was aware of the playground's close proximity to the headwall/inlet pipe. See Starling v. Selma Cotton Mills, 168 NC 229 (84 SE 388); Franks v. Southern Cotton Oil Co., 78 SC 10 (58 SE 960). Condition (c): The jury was authorized to find, given the circumstances of this case, that the children because of their youth did not realize the danger involved. Whether a child fleeing from what she perceived to be one danger was capable of recognizing the hazard posed by the swirling cauldron of water was an issue for jury determination. Condition (d): Although the cost of keeping children away from the headwall/inlet or providing a closed system might have been prohibitive, since inspection and periodic cleaning of the inlet pipe would not have been an undue burden on Atlanta Housing we find this condition was met. Condition (e): Here Atlanta Housing's inattention and failure to consider itself in any way involved or concerned with maintenance and upkeep of its premises could be considered as tantamount to a failure to exercise reasonable care to eliminate the danger.

On reconsideration of the matter, condition (b) poses a serious problem.

In our interpretation of the language of condition (b) we recognize that Restatement (1st) of Torts (1934) used the terminology "knows or should know" of the unreasonable risk while Restatement (2d) of Torts (1965) utilizes the expression "know or has reason to know." Both versions follow with: "and which he realizes or should realize" will involve an unreasonable risk.

Atlanta Housing argues that "should know" is the equivalent of constructive knowledge but that "has reason to know" is something less. The comment to condition (b) Restatement (2d) of Torts states: "The possessor is under no duty to inspect or police his land to dis-

cover whether such conditions [posing an unreasonable risk] exist and he becomes subject to liability only when he knows or has reason to know that they do exist, and that they are dangerous." Counsel for Atlanta Housing argues that " 'Reason to know' means that the possessor has information from which a person of reasonable intelligence, or intelligence superior to the actor, would infer that the condition in question exists, or that the possessor would conduct himself on the assumption that the condition does exist." It is conceded that a duty is imposed where the possessor of land "otherwise receives information which would lead a reasonable man to conclude that a condition dangerous to trespassing children exists."

Under the facts of the case sub judice in 1974 Atlanta Housing knew "that a very serious hazardous condition was caused by this inlet opening (i.e., children playing in adjacent play area could fall in opening)." It also had a series of complaints from G & M's executive that Atlanta Housing was not providing maintenance or upkeep for the parcels it owned (this it also well knew). It had in effect declined to maintain the area encompassing the headwall/inlet pipe and had assumed someone else would take care of it without any concrete basis for such reliance. Although its officials denied knowledge of prior flooding (resulting from accumulation of debris), any lack of knowledge by Atlanta Housing was occasioned solely by its refusal to take responsibility for upkeep and maintenance of property to which it held title.

Since here are the elements of knowledge of a risk and the failure to assume any duties with regard thereto, this would ordinarily be sufficient for a jury to find "reason to know" of a potentially hazardous condition. However, the fact the defendant might have a responsibility to take some action does not insure the right of the plaintiffs to recover. As we have re-emphasized throughout this opinion, negligence is actionable only where it is an effective cause of the damage suffered.

Regardless of whether the defendant's nonaction might be considered negligent as to a purely "static" condition, here the sewer was an unreasonable risk (insofar as flooding is concerned) only when it was clogged or obstructed. Where a dangerous condition is not permanent but must have existed for only a limited time prior to the occurrence, the rule is applicable that the defective condition must be shown to have existed for a sufficient period of time for the defendant to have discovered and remedied it. *Professional Bldg. v. Reagen,* 129 Ga. App. 183, 184 (199 SE2d 266); *Hood v. McCall Clinic,* 145 Ga. App. 314 (243 SE2d 571). As stated in *Hughes v. Winn-Dixie Stores,* 142 Ga. App. 110, 111 (235 SE2d 619): "In the absence of any evidence that the defect existed at some time in the past, the appellant failed to carry her burden of proof and was not entitled to recover."

The only exception to this rule is "where defendant or its agents are in the immediate vicinity or area of the dangerous condition . . . and could easily have remedied it." *Burger Barn v. Young*, 131 Ga. App. 828, 829 (207 SE2d 234).

Here the proof offered demonstrated that prior to the occurrence the area around and the inlet pipe itself had been cleared out. However, there was no evidence as to when the condition (obstruction of the pipe) manifested itself. Here it even could be argued that the flooding waters washed sufficient debris into the inlet pipe to have caused it to clog up. The burden was on the plaintiffs to show that it was in existence a sufficient period of time for the defendant to have discovered it and taken appropriate action. For, unless there was such a time span then the defendant's nonaction would be inconsequential.

The plaintiffs having failed to carry a burden essential to their case, a judgment in their favor cannot stand. We do not find that the grant of a directed verdict for Atlanta Housing would be appropriate since this issue, although as to a vital element, was not raised in the court below. Therefore, under OCGA § 9-11-50 (e), we order that a new trial be had "to meet the ends of justice under the facts of this case." *Gandy v. Griffin*, 120 Ga. App. 100, 104 (169 SE2d 651); *Winn-Dixie Stores v. Hardy*, 138 Ga. App. 342, 345 (226 SE2d 142); *Harrison v. Harrison*, 228 Ga. 126, 128 (184 SE2d 147); *Tomlinson v. Patrick*, 228 Ga. 373, 377 (185 SE2d 407).

(b) It should be observed the legal maxim that one should have a reasonable time to discover and correct a defective or dangerous condition constitutes another reason why a judgment against Villa Monte Homes and G & M was not proper. Logic dictates that if a landowner or the actual possessor of land is not liable for a defect when the time it came into existence is not shown, how then may a volunteer be responsible for such condition? Especially where the volunteer had in the past carried out cleanup of the facility and there is no showing that it was conducted in a negligent manner, the plaintiff should establish a reasonable time span for the defendants to have acted. Such element was missing as to the case against the other two defendants.

5. Because of the grant of a new trial, the enumerations of error involving jury instructions must be passed upon.

(a) Atlanta Housing submitted the following written request to charge: "Loss of life incurred in rescuing another from a situation of peril gives rise to no cause of action against one who is guilty of no negligence, either as to the person whose safety was imperiled or as to the rescuer after his efforts to make the rescue had begun." The trial judge declined to give the request and error is asserted.

This request contains the exact language found in *Jackson v. Standard Oil Co.*, 98 Ga. 749 (1) (26 SE 60). We recognize that language contained in an appellate decision, although embodying sound

law, may be improper to use in a charge. *Slater v. Dodd*, 108 Ga. App. 879, 880 (134 SE2d 848); *Savannah, Fla. & Western R. Co. v. Evans*, 115 Ga. 315, 318 (41 SE 631). Nevertheless, "A charge in the language of the Supreme Court adapted to the issues of the case, and appropriate instructions to the jury, generally should, when requested, be given in charge to the jury." *Thomas v. State*, 95 Ga. App. 699 (2) (99 SE2d 242).

Here the charge was a proper statement of the law, adjusted to the issue and nonargumentative. It is contended that the charge would instruct the jury that the evidence showed the defendant not to be negligent when in fact there was ample evidence of Atlanta Housing's negligence. What this overlooks is that the jury could have found that Atlanta Housing was not negligent. What this instruction would have told the jury is that there must be fault in order for there to be liability and that unless defendant was negligent the fact that one child drowned and her sister, while trying to save her, also drowned, would not entitle the plaintiffs to recover. It was error to refuse the written request.

(b) Error is assigned on the failure to give the following request to charge: "An open pond of water, whether natural or artificial, does not, of itself, constitute a man trap."

Under *Gregory v. Johnson*, 249 Ga. 151, supra, and its newly adopted five-condition test the language regarding what does, or does not, constitute a man trap (discussed in *Crosby v. Savannah Elec. &c. Co.*, 114 Ga. App. 193, 199, supra; *Montega Corp. v. Grooms*, 128 Ga. App. 333, 336 (3), supra; and *Savannah &c. R. Co. v. Beavers*, 113 Ga. 398 (39 SE 82)) no longer is of crucial significance. Now the test is if "the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children." *Gregory v. Johnson*, 249 Ga. 151, 154, condition (b), supra.

Thus, it was not error to fail to give the requested charge.

(c) The refusal to give the following request to charge is enumerated as error: "Perils of deep water are instinctively known, and if it be insisted that a child of nine years of age did not possess such ordinary discretion as fairly as [sic] to appreciate this danger, then it may be urged with propriety that the child should not have been allowed to go into the vicinity of a body of water."

Although this language is found in *McCall v. McCallie*, 48 Ga. App. 99 (5) (171 SE 843), this request is argumentative and not adjusted to the facts of the case sub judice. It was not error to refuse that request.

(d) The last enumeration of error is that a portion of the court's instructions to the jury was incomplete and erroneous and that a written request to charge should have been given in order to correctly

state the principle involved.

The trial judge charged: "As to licensees, *the owner or occupier of premises has the duty to make reasonably safe those conditions on the premises which are known by the occupier to be defective or to give warning to the licensee of the condition.* He is not under the duty to such persons to generally maintain the premises in a reasonably safe condition or to inspect the premises for defects." (Emphasis supplied.)

The charge requested was as follows: "The duty to warn extends only to latent dangers — not those which are open and obvious."

Counsel for Atlanta Housing contends that the italicized language was misleading because it requires a landowner to give warning of *any* defective or hazardous condition when in fact the law requires that one warn of hidden dangers. Therefore, it is argued that the requested charge is necessary to explain that the duty to warn includes only hidden or "latent" dangers.

The written request stated a proper principle of law in qualifying the language actually given in charge. *Young Men's Christian Assn. v. Bailey*, 112 Ga. App. 684, 698 (146 SE2d 324); *Higginbotham v. Winborn*, 135 Ga. App. 753, 756, supra.

It should be observed, however, that on a retrial what amounts to a "latent danger" must be measured by the capacity of the children because of their youth to recognize or realize the danger. See *Gregory v. Johnson*, 249 Ga. 151, 154, condition (c), supra.

*Judgment reversed with direction that a new trial be granted in 67078; judgment reversed with direction that the trial court enter judgment for the defendants in accordance with their motions for judgment notwithstanding the verdict in 67079. Sognier and Pope, JJ., concur.*

DECIDED MARCH 29, 1984 —

*J. Loren Fowler, James B. Gurley,* for appellant (case no. 67078).
*W. Pitts Carr, David H. Pope, Sidney F. Wheeler, Lenwood A. Jackson, William A. Dinges,* for appellee.
*William A. Dinges,* for appellants (case no. 67079).
*James B. Gurley, Sidney F. Wheeler, Lenwood A. Jackson, David H. Pope, W. Pitts Carr,* for appellees.