## 70243, 70244. KILMARK v. BOARD OF REGENTS;
and vice versa.
(334 SE2d 890)

BEASLEY, Judge.

These appeals are from the Superior Court of Forsyth County affirming in part and reversing in part an order of a special master appointed by the Georgia Office of Fair Employment Practices (GOFEP). The case arose on November 5, 1981, when Patricia

Kilmark, a white female County Extension Agent employed by the Georgia Cooperative Extension Service under the supervision of the Board of Regents of the University System of Georgia, and the Board of Commissioners of Forsyth County, filed a charge of discrimination with the Equal Employment Opportunity Commission, which referred the charges to the Georgia agency. After a finding of reasonable cause by GOFEP and appointment of the special master, a two-day hearing was held, resulting in a final order finding that the Board of Regents had discriminated against Ms. Kilmark on the basis of her sex when it selected Mr. Hugh McMillan as director of the Forsyth County Extension Service Office.

The evidence presented and the facts as found by the special master may be summarized as follows. In August of 1981 the position of County Extension Director (CED) became vacant upon the retirement of Walter Rucker, the agent who had held the position in Forsyth County since its inception about 28 years previously. The responsibilities for this position are administrative in nature, including supervision of the other county agents and secretaries, liaison between the County Extension Office and the Board of County Commissioners and the Board of Education (primarily the presentation of an operating budget to the Boards), and coordination of all the extension programs. Prior to 1973 a degree in agriculture or a related field was a prerequisite for the position, but it was abandoned in recognition of the administrative nature of the job duties. This requirement had the effect of eliminating from consideration the female county agents with degrees and expertise in home economics. In spite of the modification, at the time the charges were filed there were only 12 female CEDs out of a total of 153, only one more than when the change was implemented in 1973 and 11 women were immediately appointed, while 46% of the agents in the state were female.

The practice and policy of the Board of Regents is to assign the leadership responsibilities to an agent already on the staff of a particular county office when a vacancy occurs. The Extension Service, a component of the University of Georgia and thus under the general supervision of the Board of Regents, is divided into districts, each of which has a director with authority to make recommendations concerning employment and position assignment. When Rucker retired, two agents in Forsyth County were considered for the assignment as CED, Kilmark, then aged 41, and McMillan, then aged 26.

Kilmark was first employed by the Extension Service in DeKalb County in 1968 with major program responsibilities in the areas of 4-H and youth activities and adult home economics. On May 1, 1981, she was promoted to the position of Home Economics Coordinator and transferred to Forsyth County, receiving a 15% increase in salary. She has a B.S. degree in Vocational Home Economics Education

from Michigan State University and a M.A. in Education from Murray State University.

McMillan began employment with the extension service in Forsyth County in January of 1979, having previously held only part-time jobs as a student. He had received a B.S. degree in Animal Science from the University of Georgia in 1977 and completed 65 hours of study at the school of veterinary medicine at the University of Georgia at what the Board of Regents considered to be an honors level. The description of the requirements for the position of CED requires "an appropriate Master's degree from, or admission to, an approved graduate school."

The appointment procedures for the promotion to CED are extremely informal throughout the state, with no applications taken and no persons interviewed. Usually the District Director of the County Extension Service and the County Administrator recommend an individual from the county staff to the Board of County Commissioners for final approval, and in this instance Kilmark was informed by the District Director that he would recommend appointment of a new CED after two vacant agent positions were filled by November 1, 1981. However, on October 16 he recommended McMillan for both agent and CED with almost a 31% increase in salary. The selection was made prior to filling the staff vacancies because of budgetary constraints. The recommendation was approved and announced on October 19.

The District Director testified that McMillan's selection over Kilmark was based on a number of factors. During the selection process the Forsyth County Board of Commissioners adopted a resolution, dated September 1, recommending McMillan for CED and reciting that the Board had received numerous complimentary remarks concerning his work from Forsyth County citizens and that he was highly accepted in the community. The Board of Regents contended that McMillan's management and leadership skills were superior to Kilmark's, but the special master found no evidence to support this evaluation as the Board was unable to give any examples demonstrating his skills. She found rather that neither McMillan nor Kilmark had had any "significant" experience in management or administration, although Kilmark had recently been promoted to the position of Home Economics Coordinator, which required that she create and implement an entirely new adult home economics program in Forsyth County. Also, witnesses for both parties testified as to Kilmark's successful stimulation of community interest in, and support of, her programs. In her only written evaluation in Forsyth County, Rucker gave her a score of 8 out of a possible 10 and noted that she had "received positive community support." While McMillan's performance in the 4-H and youth program was also rated 8 out of 10, McMillan himself

admitted that the program had long been popular in the school system and that he was not responsible for creating the program or stimulating community interest and participation.

The special master also considered the inconsistencies in appellants' defenses that Kilmark had had interpersonal difficulties and that McMillan had superior human relations skills. The District Director first testified that Kilmark's performance as a home economist had been good, but indicated that some problems developed with her programs after she became coordinator in Forsyth County. However, none of these problems were mentioned in her written evaluations or were revealed until after she filed charges of sex discrimination. The district Home Economics Supervisor testified that Kilmark's programs overemphasized crafts and that she overutilized community resource persons rather than teaching the programs herself, but she was able to identify only one craft-related program Kilmark had presented in Forsyth County, and this was after the promotion decision had been made. The supervisor further testified that she had counselled Kilmark (and other home economic agents as well) with respect to both of these problems before Kilmark's promotion to Coordinator in Forsyth County. Testimony by Rucker and McMillan, that Kilmark had interpersonal difficulties with office personnel and community members, was likewise contradicted and discredited by the witnesses alleged to have voiced such opinions, and there was again no mention of any such problems in her written evaluations. The suggestion that Kilmark was not as qualified for the position as McMillan because she did not establish a permanent residence in Forsyth County was without foundation. Kilmark testified that from the time she began her employment in Forsyth County she rented a house and spent at least 80% of her time in the county; that at no time did she commute; that she held programs and attended county meetings at night. There was also evidence that numerous CEDs in other counties did not live in the county of their employment and that CEDs often transferred from county to county, leading to the inevitable conclusion that there was no apparent correlation between effectiveness as a CED and the county of residence. Finally, in regard to the resolution passed by the Board of Commissioners endorsing McMillan's appointment on September 1 immediately following Rucker's retirement, there was no evidence that anyone other than McMillan was considered or that any members of the public had any knowledge of the candidates for the position. Nor was there any evidence that members of the public had expressed a desire that McMillan be appointed, which is what the chairman of the commission and the County Administrator stated was the basis of the endorsement, or that either of these witnesses had any professional contact with McMillan as an agent. While the County Administrator testified that he expressed a

negative reaction to Kilmark during the selection process, the letter written to "confirm" the discussion of his negative reaction was dated more than a month and a half after the meeting and two weeks after Kilmark brought sex discrimination charges.

Based on her findings of fact, the special master concluded that appellants had engaged in an unlawful practice in violation of OCGA § 45-19-29 (1); that the alleged nondiscriminatory reasons advanced for hiring McMillan were unsupported by the evidence, pretexual in nature or not legitimate bases for decision; and that these reasons were particularly suspect given the subjective nature of the qualifications, the male evaluators and the informal selection process which was not even in accordance with normal procedure. She further noted that the recommendation of a candidate by the Board of Commissioners, which was entitled only to have the right of final approval, was "ripe with opportunity" to prejudice the decision of the District Director; and that the confirmation of a conversation almost two months previously, purporting to outline Kilmark's weaknesses by the County Administrator, bore a suspicion of record reconstruction for the purpose of justifying a selection process biased against Kilmark. Finding that the difficulty in such a case was in fashioning an appropriate remedy, the special master determined that Kilmark's instatement as CED was mandated by the facts and by law; that while the record would support awarding the same salary increase to Kilmark as was given McMillan, she would limit the award to an increase of 15% of her salary in October of 1981; and that Kilmark should receive such salary effective October 20, 1981 and reasonable attorney fees in the amount of $4,722.

The Board of Regents petitioned for review of this order by the superior court, which affirmed the findings of fact of the special master but modified the relief granted to make the salary increase effective as of November 1, 1982; also, rather than instating Kilmark to the position of CED, the court ordered the application and decision process for the appointment to be reopened and conducted according to law on a nondiscriminatory basis. Appeal is brought from this judgment by the Board of Regents (Case No. 70244), which contends that the award of the special master is subject to reversal under the provisions of OCGA § 45-19-39 (b) (1), (2), (3) and (6). Kilmark appeals (in Case No. 70243) only that portion of the superior court's order reversing in part the relief granted by the special master.

All parties agree that review of the special master's order is governed by OCGA § 45-19-39, which limits the scope of six possible grounds. Here, the Board claims four of them[1] and agrees that the

---

[1] (1) In violation of constitutional or statutory provisions; (2) In excess of the statutory

"any evidence" rule applies to findings of fact (*Dept. of Human Resources v. Montgomery*, 248 Ga. 465, 466 (284 SE2d 263) (1981)), and that the court cannot substitute its judgment on the weight of the evidence. We note that the last ground, which is asserted in the sixth enumeration of error, is not involved as that enumeration was not briefed and thus is considered abandoned. Court of Appeals Rule 15 (c).

1. The first enumeration is that the special master misallocated the burden of proof. In *McDonnell Douglas Corp. v. Green*, 411 U. S. 792 (93 SC 1817, 36 LE2d 668) (1973), the United States Supreme Court "set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment. First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' Id. at 802. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. Id. . . . The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. [Cits.] . . . The burden of establishing a prima facie case of disparate treatment is not onerous. The plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination. The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection. [Cits.] . . . [T]he prima facie case 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.' Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case.

"The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate,

---

authority of the agency; (3) Made upon unlawful procedures; (6) Arbitrary, capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. [Cit.] It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions." *Texas Dept. of Community Affairs v. Burdine*, 450 U. S. 248, 252-56 (101 SC 1089, 67 LE2d 207) (1981); applied in *Ga. Bureau of Investigation v. Heard*, 166 Ga. App. 895 (305 SE2d 670) (1983).

The Board concedes that Kilmark established a prima facie case. See, e.g., *Crawford v. Western Elec. Co.*, 614 F2d 1300 (5th Cir. 1980). It argues instead that the special master erroneously placed the burden upon it to show the *absence* of discriminatory motive and intent, rather than simply to articulate its legitimate nondiscriminatory intent as required by *Burdine*, and to require Kilmark to prove the *presence* of discriminatory motive and intent. The Board contends that this misallocation of the burden of proof is shown by the special master's finding that it did not prove McMillan's academic performance while enrolled in veterinary school when no such proof was required; the disregard of the testimony of the home economics coordinator, who was a woman, by finding that the assessment of the candidates was by an all-male review; and discounting the articulated, nondiscriminatory reasons for the Board's actions as pretextual in nature and not legitimate bases for decision because of the subjective nature of the qualifications, the male evaluators and the informal selection process.

This analysis is not accurate. Because of the subtleties inherent in many acts of discrimination, courts have recognized that the question facing triers of fact in such cases is both sensitive and difficult. Thus, as explained in *Burdine*, once the defendant has articulated the reasons for its decision, the plaintiff "must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by per-

suading the court that a discriminatory reason *more likely* motivated the employer or indirectly by showing that the employer's proffered explanation is *unworthy of credence.* [Cit.]" (Emphasis supplied). Id. at 256. See also *U. S. Postal Svc. Bd. of Governors v. Aikens,* 460 U. S. 711, 716 (103 SC 1478, 75 LE2d 403) (1983).

As noted by the *Aikens* court, "none of this means that trial courts or reviewing courts should treat discrimination differently from other ultimate questions of fact. Nor should they make their inquiry even more difficult by applying legal rules which were devised to govern 'the basic allocation of burdens and order of presentation of proof,' [cit.], in deciding this ultimate question. The law often obliges finders of fact to inquire into a person's state of mind. . . . 'The state of a man's mind is as much a fact as the state of his digestion. It is true that it is very difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained it is as much a fact as anything else.' [Cit.]" Id. at 716-17. Here the special master specifically rejected the Board's proffered reasons for its decision as a pretext for discrimination, finding under the *Burdine* standard that they were unworthy of credence. At no point was the Board required to prove the absence of discriminatory intent. Rather, the special master acknowledged its articulated reasons for selecting McMillan and rejecting Kilmark and found an intent to discriminate because Kilmark demonstrated through her evidence that the reasons proffered lacked actual basis in fact or, through cross-examination of the Board's witnesses, discredited the explanations they offered. Accord *Harris v. Richards Mfg. Co.,* 511 FSupp. 1193 (W. D. Tenn. 1981); *Lindsey v. Angelica Corp.,* 508 FSupp. 363 (E. D. Mo. 1981). The Board's complaint here is in essence simply an evidentiary one; it fails to show that an erroneous legal theory was used. Since the findings of the special master, affirmed on review by the superior court, were clearly supported by the evidence of record, we find no grounds for reversal within the meaning of OCGA § 45-19-39 (b) as alleged by the Board. *Dept. of Human Resources v. Montgomery,* 248 Ga. 465, supra.

2. We take up next the Board's fifth enumeration because it also relates to the finding of discrimination whereas the remaining claimed errors concern remedies. Here the Board contends that the special master discounted and ignored the importance of community acceptance and approval as a legitimate factor in the appointment of one for this public leadership position, which was testified to by the county administrator and the chairman of the Board of Commissioners and was given by the board in its resolution as a primary reason for its approval of McMillan. This was the final articulated basis proffered to the special master.

The record simply does not support this characterization. In the lengthy order, the special master recited this basis, opined that it is a

dangerous one because it is founded only on *"perception* of the job performed and the results *allowed* to be achieved, not to an *ability* to perform" (emphasis supplied), and considered it comparable to the "customer preference" factor prohibited in *Diaz v. Pan American World Airways*, 442 F2d 385 (5th Cir. 1971). The special master thus eliminated this ground as a legitimate defense in this particular action. This would not be contrary to our case of *Horne v. Skelton*, 152 Ga. App. 654, 657 (263 SE2d 528) (1979). There we acknowledged that "if the [appointing authority] determines that the local concern and reaction to the selection of the recommended applicant — arising not from the applicant's race or other impermissible criterion but from the public's perception of the applicant's ability to render them impartial service — would proximately result in the diminution of effectiveness to run the department, and would result in an adverse public image for the county and state departments, the [appointing authority] should not be required to ignore such considerations in his capacity as appointing authority."

In the first place, the county officials were not even considering Kilmark, because the board was unaware of her candidacy, so the expected community reaction to her being appointed was not a factor in its recommendation. Second, to be a legitimate factor, the reaction would have to be bottomed on the community's perception of Kilmark's ability to perform, not on the impermissible criterion of sex. The reasonably predicted adverse community reaction which was evidenced and found to be of valid concern in *Horne* was based on the fact that the applicant's mother-in-law had been convicted of welfare fraud against the applicant's employer, in the same county wherein applicant would be the director of social welfare. As to Kilmark, however, there was no evidence that the community's reaction, if she were appointed, would be adverse or would result in diminution of the program's effectiveness or the government's image.

Moreover, laying all of that aside, the special master found that if this subjective criterion was permissible, it failed on its merits because the employee showed that she enjoyed community support and rebutted the Board's contrary position. The evidence supports this finding and we, like the superior court, are unauthorized to interfere. OCGA § 45-19-39 (b) (5). As mandated in the opening paragraph of subsection (b), the special master's judgment on the weight of the evidence is conclusive and final.

3. The Board also asserts that the special master committed an error of law by substituting her judgment for the Board of Regents in the assignment of a position of leadership, because the Board has express statutory authority to make personnel assignments and decisions within the Cooperative Extension Service under OCGA §§ 20-3-31 and 20-3-32. The duties and powers granted thereunder, however,

are limited "by such restraints of law as are directly expressed, or necessarily implied," *Villyard v. Regents of Univ. System*, 204 Ga. 517, 520 (50 SE2d 313) (1948), and we agree with the Attorney General that the Board is subject to the coverage of the Fair Employment Practices Act. See Op. Atty. Gen. No. 80-74 (1980). In this case, as noted by the special master, there was no issue as to whether the usual selection procedures were fair or subject to safeguards, because the Board did not follow its own stated procedure. Thus her decision that Kilmark had proved the pretextual nature of the Board's articulated non-discriminatory reasons for denying the promotion were based primarily on three factors: the subjective nature of the qualifications; the all-male evaluators; and the informal selection process which deviated from the normal procedure. As the court said in *GBI v. Heard*, 166 Ga. App. 895, supra at 899: "when dealing with subjective rather than facially-neutral and hence objective employment procedures, the case is to be treated as one involving 'disparate treatment' wherein the plaintiff's prima facie case is shown by evidence that the subjective decision to deny him a promotion was racially motivated and the defendant's rebuttal evidence relates to defending his subjective decision in that regard as having been based upon legitimate, nondiscriminatory reasons. Once all the evidence is adduced, the trier of fact will then be 'in a position to decide the ultimate factual issue in the case[,] . . . "whether the defendant intentionally discriminated against the plaintiff." [Cit.]' *U. S. Postal Service Bd. of Govs. v. Aikens*, 103 SC, supra at 1482."

The troublesome aspect of subjective procedures has been focused on by other courts as well: "Although not illegal *per se*, subjective promotion procedures are to be closely scrutinized because of their susceptibility to discriminatory abuse. [Cits.] The mere fact that the subjective process is intended to recognize merit does not necessarily alleviate its susceptibility to discriminatory abuse. When the evaluation is in any degree subjective and when the evaluators themselves are not members of the protected minority, the legitimacy and non-discriminatory basis of the articulated reason for the decision should be subject to particularly close scrutiny by the [trier of fact]. [Cits.]" *Royal v. Mo. Hwy. & Transp. Comm.*, 655 F2d 159, 164 at n. 10-12 (8th Cir. 1981). "Obviously, the more subjective the qualification sought and the more subjective the manner in which it is measured, the more difficult will be the defendant's task in meeting the burden imposed by *Burdine*." *Robbins v. White-Wilson Med. Clinic*, 660 F2d 1064, 1067 (5th Cir. 1981), vacated on other grounds, 456 U. S. 969 (102 SC 2229, 72 LE2d 842) (1982).

Where, as here, the plaintiff has proved intentional discrimination within the framework of *Burdine*, neither the special master nor the trial court substituted her or its judgment for that of the Board.

4. The Board of Regents contends that the special master erred in ordering a salary increase and back pay award to Kilmark, and that the trial court compounded that error by ordering a back pay award based on the findings of the special master but without Kilmark's promotion to the duties of CED.

OCGA § 45-19-38 (b) and (c) vests the special master with authority to take such remedial action as in his or her judgement will rectify the unlawful employment practices so as to carry out the purpose of the statute, and such remedial action may include "[h]iring, reinstatement, or upgrading of employees with or without back pay." The broad purposes of Georgia's Act, which "shall be broadly construed to further the . . . purposes stated . . . ," may be found in OCGA § 45-19-21. One is "to promote the elimination of discrimination against all individuals in public employment because of such individuals' . . . sex, . . ." OCGA § 45-19-21 (a) (3).

Since this issue is one of first impression in this state, it is appropriate under the ruling in *Montgomery* discussed in Division 1, supra, to consider the leading cases construing the extent of relief to which employees are entitled under the virtually identical provision of Title VII (42 USC § 2000 (e) - 5 (g)). See OCGA § 45-19-21 (a) (1). In *Albemarle Paper Co. v. Moody*, 422 U. S. 405 (95 SC 2362, 45 LE2d 280) (1975), the Supreme Court established that the award of back pay was an obvious connection in achieving the primary objective of Title VII to remove barriers that have operated in the past to favor one group of employees over another, both to provide a "spur or catalyst" to employers and "to make persons whole for injuries suffered on account of unlawful employment discrimination." Id. at 417-18. Because Title VII deals with legal injuries of an economic character, " '[t]he general rule is, that when a wrong has been done, and the law gives a remedy, the compensation shall be equal to the injury. The latter is the standard by which the former is to be measured. The injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed.' [Cit.]" Id. at 418-19. "It follows that, given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination. The courts of appeals must maintain a consistent and principled application of the back pay provision, consonant with the twin statutory objectives, while at the same time recognizing that the trial court will often have the keener appreciation of those facts and circumstances peculiar to particular cases." Id. at 421-22. See also *Franks v. Bowman Transp. Co.*, 424 U. S. 747 (99 SC 1251, 47 LE2d 444) (1976).

The Georgia Act has multiple purposes to be served. OCGA § 45-

19-21. We recognize that Kilmark has not earned that additional amount in that she has not performed the assignments of the director's position in this interim. But one of the purposes of the Act is "to promote the elimination of discrimination." If it could exist in our government with only the threat of instatement of a person after a long-fought court battle, there would be weak incentive to comply as the odds would favor continued discrimination. Monetary considerations, however, would provide more powerful persuasion. This was apparently recognized by the special master and by the court below.

But was back pay authorized in this case?

The Equal Employment Opportunity officer of the office of the President of the University of Georgia testified that it is not automatic that an increase be given to a person who is appointed director, and that in fact there may be no increase; none is required.

Thomas Helton, District Extension Director for North Central Extension District since January 1979 and previously county extension director for DeKalb, who is primarily responsible for McMillan's selection, testified that Kilmark called on Monday to get clarification of some things that were said when Helton told her on Friday that McMillan had been appointed. He said that in response to her statement that she needed money and this would have given her a better salary, he said, "my comment was that County Director appointments do not necessarily mean additional monies. I do recall telling her or pointing out to her, keep in mind, Pat, it has only been a short period of time since you moved in there with a considerable increase in money, so, you know, that's about the extent of the conversation as it related to money." He also testified that McMillan, when appointed county agriculture agent and county extension director, was given a salary increase of $4,693, from $15,307 to $20,000; part of the consideration apparently was that the budget permitted it since the retiree's salary had been higher. This obviously was much more than a "15%" increase and appears not to have been based on a percentage measurement.

Ms. Kilmark's salary was higher than McMillan's before and after his raise. She claims she would have been given a 15% increase over her then-current salary, i.e., an increase of $4,961. This is based entirely on the telephone conversation she had with Helton on Monday. She stated: "He told me also in the course of the conversation that he couldn't afford to pay me 15% of the salary that I was making at that time to be director. He told me that Hugh was at the lower salary level and that 15% of his salary could be met. I didn't think that was a very good —

"Q. Did you understand at that time that it wasn't necessary to give you any raise at all?

"A. I asked him — I said, Mr. Helton, did it ever occur to you

that I would have accepted the position of director without any increase in salary?

"Q. Why would you have done that?

"A. Because I would have liked to have been afforded the professional courtesies to have decided for myself if I wanted the director at no increase in salary or not. I felt like the decision had been made for me. I am very capable of deciding such on my own."

The special master found: "Although there was testimony to the effect that a salary increase did not automatically follow a promotion to Director, in this case there was a salary increase in the amount of $4,961.00,[2] given to McMillan. Kilmark and Helton's testimony conflicted as to whether or not Helton told Charging Party she was not promoted because he could not afford to pay her an increase of fifteen percent of Charging Party's salary at the time. Nonetheless, the increase given to McMillan was greater than the fifteen percent increase for which Kilmark claims entitlement. This Court finds that the record would support awarding Charging Party the sum given McMillan. However, in light of Charging Party's assertions at the hearing and in post-hearing argument, this Court limits its award to the lesser sum of fifteen percent of her salary in October, 1981."

Thus, taking the evidence in the best light for the employee, the award of back pay was based entirely on a disputed remark made by the district director in discussing McMillan's appointment. There was no showing that Kilmark would have received a 15% increase, or any increase for that matter, or that the budget would have allowed it. As she admitted, the increase was not automatic, was not a set amount nor a set percentage. It was determined in a discretionary manner on a case-by-case basis, taking into account factors such as the additional duties relative to the employee's prior duties, the employee's salary as compared to those of the people he or she would supervise, the size and time of the employee's last salary increase, the current budget. There is no evidence that this had been done by the appointing authority. Moreover, in McMillan's case, he was not only being appointed director, but was also being raised to agriculture agent from his prior lower position. There is no evidence of what portion of the increase was attributable to the directorship. A "15%" measurement was not applied to him. There is no evidence of guidelines or pay scales or policies which would entitle Kilmark to a 15% increase should she become director. Nor is there any evidence that she would have been awarded that sum had she been appointed. She acknowledged that she could not have insisted on it as an entitlement by way of policy or practice or regulation or law, if the job had been offered

---

[2] Actually $4,693.

to her. That being the case back then, it is certainly still the case now. Therefore, the evidence does not establish a right to back pay. The basis for the special master's award is too tenuous. There is insufficient evidence to support a "15%" increase, to be paid for the now nearly 4 years since the appointment, for work which the employee has not done but was prevented from doing due to the discriminatory selection of someone else for the job, when there is no assurance that she would have received or been entitled to such an increase had she been selected.

The rate of pay upon instatement will have to be determined by the agency based on current legitimate factors which are used by the board in setting the salary of a director.

5. We are unconvinced that, as asserted by the Board, the superior court erred in not reversing and remanding the special master's award of attorney fees. While we are aware of the general rule that fees for services rendered by an attorney must be paid by the person who employs him and are not recoverable by a litigant against the opposite party unless they are specifically provided for by statute or contract, *Johnson v. G. A. B. Business Svcs.*, 170 Ga. App. 686 (1) (318 SE2d 78) (1984), the fact that the Georgia Fair Employment Practices Act was not amended until 1983 to expressly allow attorney fees and costs for appeal to the superior court is not dispositive of the question of the authority of the special master to award them in this case, as we view the scope of remedial relief found in the Act. See OCGA § 45-19-39 (c), Ga. L. 1983, p. 1097, § 1.

The attorney fees provision under Title VII has been construed as an integral part of the enforcement scheme in order to maximize the rights secured in the Civil Rights Act. *Albemarle Paper Co.*, supra, 422 U. S. at 415; *Newman v. Piggie Park Enterprises*, 390 U. S. 400 (88 SC 964, 19 LE2d 1263) (1968). Thus it was held in *New York Gaslight Club v. Carey*, 447 U. S. 54 (100 SC 2024, 64 LE2d 723) (1980), that not only does Title VII authorize federal courts to award attorney fees for legal work done in state administrative and judicial proceedings, the failure to make such fees available "would undermine Congress' intent to encourage full use of state remedies." Id. at 66, n. 6. The Court further noted that "Congress' power under § 5 of the Fourteenth Amendment is broad, and overrides any interest the State might have in not authorizing awards for fees in state proceedings." Id. at 67. We are unable to conclude that the expansive remedial authority provided by the Georgia Act (Ga. L. 1978, p. 859, § 16), including the "monetary award . . . for actual damages" allowed under OCGA § 45-19-38 (d), would not vest the special master with sufficient discretion to award attorney fees as a part of making the claimant whole for the injuries suffered, as is clearly intended. Accordingly, we find no abuse of this discretion.

6. In her appeal, No. 70243, Kilmark enumerates as error the trial court's modification of the special master's award of back pay to begin one year after the effective date of the discrimination. The issue is mooted by our ruling above on back pay.

7. Kilmark also complains of the superior court's modification of the special master's order immediately instating her as CED with direction that the board reopen the application process for the position and conduct the search on a non-discriminatory basis. No reasons were articulated for this modification of the special master's order. It was stated in *Albemarle*, supra, that if a court declines to award back pay, it must "carefully articulate its reasons." 422 U. S. at 421, n. 14. The same should apply for other changes in the remedy fashioned by the special master.

As we have noted earlier, the scope of the superior court's review power is limited to six grounds which it can consider. OCGA § 45-19-39 (b). With regard to the court's changing the remedy, its power is limited here as well. It may affirm or remand for further proceedings. It may reverse "or modify the final order if substantial rights of the appellant have been prejudiced because the administrative . . . decisions . . ." fail on one of the six enumerated grounds. Without knowing the basis for the court's modification of the remedy, we cannot discern which one of the six grounds was considered to support substituting the requirement that the director position be reopened for the requirement that Kilmark be instated in the job.

The special master is given broad powers by law with respect to the creation of appropriate remedies. The statute expressly authorizes, and indeed commands, the special master "to take such remedial action as in the judgment of the special master will carry out the purposes of this article." OCGA § 45-19-38 (b). "Hiring, reinstatement, or upgrading of employees" is one of the specifically suggested remedies. OCGA § 45-19-38 (c) (1). Thus, it appears that the court would have had to find an abuse of discretion. It did not do so and we see none.

We cannot argue with the special master's judgment that Kilmark should now be given the position. That is what she was entitled to in 1981, she and McMillan being the only persons eligible for the job under the policies and practices of the board. To reopen it now would be unrealistic, for in the meantime McMillan will have gained almost 4 years of experience as director, thus causing a wide gap between himself and the very person who had not had that opportunity. Other changes will have occurred which would make impossible a reconstruction of the circumstances when the job became open in 1981. Others may now have joined the service, and then-existing employees have also gained in experience. To open the position now would be an incomplete remedy. Kilmark sought, and the evi-

dence shows that it would be appropriate to award her, the position itself and not just an opportunity to be considered for it.

As a general rule, when an order instating the person discriminated against requires an "innocent person" to step down from this position, alternative remedies must be considered because of the "expected resistance from and sense of unfairness to the incumbents of jobs who were not themselves engaged in discrimination and who had settled expectations in their jobs." *Spagnuolo v. Whirlpool Corp.*, 717 F2d 114 (4th Cir. 1983). Kilmark contends that this "no bumping" principle is inapplicable to the facts in this case because, as the Board emphasized during the hearing, the CED position was not a permanent appointment but was a renewable position offered on a two-year basis. Although the appointment is "usually renewed," our study of the evidence compels us to conclude that McMillan should have no reasonable expectation that he continue indefinitely in this position in Forsyth County. Under such circumstances it is incumbent upon this court to reverse the judgment below and in effect revive the order of the special master so as to make whole the victim of the Board's discrimination and place her in the position to which she is entitled, there being no abuse or clearly unwarranted exercise of discretion as contemplated by OCGA §§ 45-19-38 (b) and 45-19-39 (b) (6).

*Judgment affirmed in part and reversed in part in Case No. 70244. Judgment reversed with direction in Case No. 70243. Pope, J., concurs. Deen, P. J., concurs specially and in the judgment only.*

DEEN, Presiding Judge, concurring specially.

The majority opinion appears to fit within the lengthy legal leviathan level or pattern of large opinions of our appellate courts, along with *Williams v. State*, 251 Ga. 749 (312 SE2d 40) (1983) (81 pages); *Housing Auth. of Atlanta v. Famble*, 170 Ga. App. 509 (317 SE2d 853) (1984) (24 pages); and *Shellenberger v. Tanner*, 138 Ga. App. 399 (227 SE2d 266) (1976) (15 pages). When the latter opinion was written, one judge on the panel congratulated the author on having written an excellent opinion on the important subject, but indicated that the length of the draft qualified what was said as more appropriate for an article in a law review or law journal, and that, as it was too lengthy for an opinion of this court, he felt compelled to and did concur in the judgment only.

Concurrence in the judgment only in the instant case, however, is done not necessarily because of the length or latitude of the majority opinion (our court today for the first time is listing certain cases for non-publication in the official reports in order to reduce the size of the latter), but because of other reservations and concerns.

Perhaps the better rule would be, where the trial court (as here) reverses or modifies the order of the special master, to express in the

order of modification the reasons for reversing. There is some question, however, as to whether stipulating the reasons in the order is always a requirement. The holding in *Albemarle Paper Co. v. Moody*, 422 U. S. 405 (95 SC 2362, 45 LE2d 280) (1975), limits this application to where an award of back pay is declined. No authority is cited in the majority opinion for extension or enlargement of this standard. Since there appears to be some competent evidence to sustain the order of the special master, and since the trial court did not find that order clearly erroneous, we must reverse the trial court.

This case is one of many based on alleged job decisions and directions involving discrimination based purely on sex. Extraordinary equality efforts are sometimes extravagantly expounded and enunciated by extremists.[1] A queen may be inferior in *poker* but reigns superior and supreme in the royal game of *chess*. There are, and must be, some differences and distinctions between the sexes but without discrimination; or, if any, of a *de minimis* nature. In the opinion of the writer, however, absolute and total equality between the sexes, as between men and men and women and women, is impossible in all respects.

DECIDED SEPTEMBER 10, 1985.

*Martha M. Pearson*, for appellant.

*Michael J. Bowers, Attorney General, Wayne P. Yancey, Jr., Carl C. Jones, Senior Assistant Attorneys General*, for appellee.

---

[1] "Extremists 'are protesting that in poker, for example, two kings should not beat two queens,' says *Time* magazine at page 8 of its issue of August 21, 1972." *Emerson v. Fleming*, 127 Ga. App. 296, 297 (193 SE2d 249) (1972).