A99A0634. STEWART v. HARVARD et al.
A99A0635. SIDRE v. HARVARD et al.
(520 SE2d 752)

ANDREWS, Presiding Judge.

We granted interlocutory appeals in these two cases to consider whether Stewart, the homeowner and fiancé of Sidre, Jr., and Sidre, Jr., father of Louis Sidre III (hereinafter Louis), should have been granted summary judgment on the Harvards' negligence, attractive nuisance, and premises liability claims against her[1] and negligence and wrongful death claims against him arising from the unfortunate death of the Harvards' son, Scott, in a fire caused by Louis and Scott playing with matches while Stewart and Sidre, Jr. were away from the home.

> To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). If a defendant, as the moving party, shows that the documents, affidavits, depositions and *other* evidence in the record reveal that there is no evidence sufficient to create a genuine issue as to any essential element of the plaintiff's claim, then the plaintiff, as the nonmoving party, cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue. (Emphasis supplied.) Id. In reviewing a grant or denial of summary judgment, this Court conducts a de novo review of the evidence. *Eastside Properties v. Dept. of Transp.*, 231 Ga. App. 217 (498 SE2d 769) (1998).

(Punctuation omitted; emphasis in original.) *Phillips v. Key Svcs.*, 235 Ga. App. 564-565 (510 SE2d 304) (1998).

So viewed, the evidence was that Stewart and Sidre, Jr. became engaged in July 1995. Sidre, Jr. and his ten-year-old son, Louis, of whom Sidre, Jr. had custody, had been living without charge with

---

[1] Stewart was granted summary judgment on the Harvards' negligent supervision claim against her. *Hemphill v. Johnson*, 230 Ga. App. 478, 480 (1) (497 SE2d 16) (1998).

Stewart in her home since August 1995. The two-bedroom house was titled in Stewart's name, and there were no common financial arrangements between Stewart and Sidre, Jr. Stewart's son by a prior marriage, Steven, was 22 and also lived in the house. He occupied one bedroom, Sidre, Jr. and Stewart the other, and Louis slept in a partitioned area of the dining room. Steven Stewart worked as an electrician, generally leaving the house around 7:00 a.m. and returning around 6:00 p.m.

The Harvards lived in the same neighborhood, and their son, Scott, met Louis in 1995 while playing in the neighborhood, and the two boys became friends. Scott was two years younger than Louis. The boys played together regularly, and Scott had spent the night with Louis on several occasions. Sidre, Jr. had taken both boys to the World Series in 1995. On that occasion, Mr. Harvard brought Scott over and visited briefly. He had also been in the house on other occasions. During these visits, Mr. Harvard noticed a Bic type lighter on the kitchen counter, although its presence did not concern him at the time. Mrs. Harvard had also been in the Stewart home numerous times and knew Stewart smoked.

During the Christmas/New Year's holiday 1995, Louis had spent time with his mother, but had returned to Stewart and Sidre, Jr.'s house on New Year's Eve. Scott spent most of the holiday with Louis, who was not to return to school until January 3, 1996.

The Stewarts and the Sidres had put up a natural Christmas tree in the living room, and Stewart checked the tree every evening and watered it as needed. Although it had been her custom to take the tree down on New Year's Day, the Sidres usually did it on January 6. Stewart deposed that since the tree was still healthy and not dried out, she agreed for it to stay up until the sixth.

Mr. Harvard had been in Stewart's home a week or week and a half prior to January 2, and the tree "looked in good, great shape at the time I was there. It was in excellent shape."

Nonetheless, because Louis deposed that the tree, once it began to burn, burned real fast "because it was very dry, but it still had water in it but it was just dry at the time," we consider the issues based on the assumption that the tree was dry. *Lau's Corp.*, supra.

On Tuesday, January 2, 1996, Stewart left for work around 8:00 a.m. Before she left, she was aware that Louis did not have to attend school that day and did not want to go to day care. Stewart had told Sidre, Jr. that, in her opinion, Louis should go to Kindercare, where Sidre, Jr. had prepaid for after school and other services. Although Stewart assisted Louis with his homework and other things, Sidre, Jr. took charge of anything to do with Louis and had told her not to discipline him.

When Stewart left, the issue of whether Louis would attend day

care had not been resolved. After she left, Sidre, Jr. had decided to take Louis to day care, but Louis prevailed upon his father to allow him to stay home by himself. As Sidre, Jr. deposed, "I just made a decision off the cuff" and allowed Louis to stay. It was, according to Sidre, Jr., "my decision for him to stay home alone that day. And that was my decision at that time, but I gave him rules." Louis was not to have anyone else come into the house and had to remain near a phone so that Sidre, Jr. could call and check on him.

Mr. and Mrs. Harvard were both ill with a virus that day. Louis called Mrs. Harvard and asked if Scott could come and play with him. About an hour later, Louis came by the Harvard home and "begged" for Scott to come out and play. The Harvards allowed Scott to go and play, and the boys played outside and were seen by Mr. Harvard riding bikes and playing during the day. Neither Harvard inquired of Louis as to whether any adult was at the Stewart home that day. Mr. Harvard said that, sometime prior to January 2, Sidre, Jr. and Stewart had come to ask if Scott could visit with Louis while they went out with some friends. When asked about supervision, Sidre, Jr. assured the Harvards that, when he and Stewart were not there, Stewart's son, who was over 21, was there. According to the Harvards, this assurance is why neither of them specifically inquired of Louis regarding adult supervision on January 2. Neither Harvard had ever been introduced to Stewart's son, but had waved to him when they saw him in the yard.

Between 10:00 a.m. and 4:00 p.m., when Mr. and Mrs. Harvard spoke with Scott when he telephoned from the Stewart home, neither of them had spoken with Scott or attempted to contact anyone at the Stewart home. When Scott called at 4:00 p.m., his father gave him permission to stay another hour and told him to come home by dark. According to his mother, Scott knew that if no adult were present when he visited, he was not supposed to go inside.

Sidre, Jr. had talked to Louis by phone six or seven times during the day. When he spoke to him around 1:00 p.m., Louis told his father that Scott had come over. Sidre, Jr. told his son that they could play outside, but not to go inside. Sidre, Jr. called again at 2:30 p.m. and spoke with his son.

Louis was aware that he was not supposed to have anybody in the house when he was there alone, but he "figured my dad would call and maybe he would say it was all right." When his father called at 2:30 p.m., Louis told him that he and Scott had finished playing with the remote controlled cars outside and "we're going to watch a movie." Sidre, Jr. did not tell his son to make Scott leave.

After the boys watched part of a movie, they started wandering around the house, and one of them spotted the matchbook in the kitchen around the sink area. As Louis testified, "I don't know who

spotted them really but, you know — and then I guess we both just got this idea to strike them or whatever, and like to see who could hold them the longest or whatever." Louis reached up onto the counter and got the matches, and the two boys began striking them, seeing which one could hold the match longest "until you could feel the heat." Then, they would blow them out.

They proceeded to strike the matches, moving into the living room where the tree was located. Because some of the matches were "soft," some were struck after they had broken and the boys had to hold them right by the tip in order to strike them. One of these matches was lit, and "it went into the tree but we didn't know that; we just thought it ripped; we didn't know part of the match had light [sic], and it had just went right into the tree." Louis and Scott had also gotten a can of hair spray, and Scott was spraying it around, including in the living room, about four or five feet from the Christmas tree.

The boys did not know the tree was on fire until it began to smoke and three branches ignited. The boys initially attempted to put the fire out by throwing two bowls of water on it. Louis then tried to use a home fire extinguisher, but either he used it improperly or it malfunctioned.

Because Louis had locked the double-keyed dead bolt lock when the boys came in the house, the door to the carport could not be opened without the key. Louis had placed it on the couch in the living room but, due to panic, spent 15 or 25 seconds hunting for it. Although he found the key and the two boys went into the kitchen, by this time the smoke was already down to the dead bolt lock and Louis was unable to get the door open.

Louis then crawled on his belly into a bedroom, believing that Scott was crawling behind him. When he reached a window, he looked back and Scott was not there. He called for him, but to no avail. Scott was later found under a bed in the other bedroom and had died of smoke inhalation.

There had been no previous unauthorized use of matches or a lighter by Louis or any indication of fascination with fire. During his deposition, taken in 1998, Louis was asked if he "like[d] to light matches" and responded "[o]nly for like thrills and stuff."

### Case No. A99A0634

1. Stewart argues that she should have been granted summary judgment on any remaining negligence claim against her.

Because the trial court granted summary judgment to Stewart on the Harvards' claim premised on negligent supervision of Louis, we do not find any remaining issues of simple negligence. *Bunn v.*

*Landers,* 230 Ga. App. 744, 745 (2) (498 SE2d 109) (1998).

2. Her second enumeration deals with the Harvards' premises liability claim, and we conclude that Stewart was entitled to summary judgment on this claim.

It is not disputed by the Harvards that their son Scott was a social guest of Louis. As such, he was a licensee to whom Stewart owed the duty not to injure him wilfully and wantonly. OCGA § 51-3-2 (b); *Aldridge v. Tillman,* 237 Ga. App. 600, 602 (1) (516 SE2d 303) (1999). That the injured person was a child does not alter this standard. *Hemphill v. Johnson,* 230 Ga. App. 478, 481 (2) (497 SE2d 16) (1998) (wilful and wanton standard applied to homeowner when an eleven-year-old drowned while swimming in homeowner's pool); *Bunn,* supra at 744 (1) (same standard applied to nine-year-old social guest killed while riding a go-cart on homeowner's property); *Bowers v. Grizzle,* 214 Ga. App. 718, 719 (3) (448 SE2d 759) (1994) (same standard regarding minor child social guest who drowned in homeowner's pool).

The Harvards rely upon *Riley v. Brasunas,* 210 Ga. App. 865 (438 SE2d 113) (1993) (social guest injured by fall while jumping from trampoline onto chin-up bar) and *Barry v. Cantrell,* 150 Ga. App. 439 (258 SE2d 61) (1979) (hammock secured by dead tree fell, injuring social guest) for their contention that there is a different rule for children. Those two cases, however, are distinguished by the fact that, in both, the issue was whether the condition involved was a "man trap" or hidden peril. *Riley* concluded that the trampoline was not such a peril and the child knew the danger of falling and *Barry* found an issue of fact as to whether the homeowner was aware of the condition of the tree so as to impose upon him the duty to protect his social guest.

The actual danger encountered by the deceased or injured social guest must be known and foreseen by the property owner before any duty to protect exists. *Aldridge,* supra at 603 (1).

*Riley* also recognizes the principle that:

> [t]he dangers associated with *fire*, falling from heights, and from water are said to be normally understood by young children absent other factors creating additional risks of harm. See *Gregory v. Johnson,* 249 Ga. 151, 154 (289 SE2d 232) (1982); *McCall v. McCallie,* 48 Ga. App. 99, 100 (1) (171 SE 843) (1933). . . . While it is recognized that children of tender years and youthful persons generally are entitled a degree of care proportioned to their ability to foresee and avoid the perils that may be encountered, (cit.), this rule must be considered in the light of the fact that even young children have a *natural fear of* water, *fire* and heights. [Cit.].

*Higginbotham v. Winborn*, 135 Ga. App. 753, 757 (2) (218 SE2d 917) (1975).

(Punctuation omitted; emphasis supplied.) *Riley*, supra at 867 (1).

As pointed out in *Bowers*, supra at 720 (4), regardless of the age of the deceased or injured person, "in the absence of a breach of some legal duty toward such person by the [homeowner], there can be no liability."

There is no evidence in the record before us that, on January 2, Stewart was even aware that Scott was in her house as a guest of Louis. Mere speculation by the Harvards that she somehow should have known will not provide the missing evidence. *Bunn*, supra at 745 (1). Nor is there any evidence that merely leaving matches on a kitchen counter and having a somewhat dry Christmas tree in another room would amount to the necessary wilful and wanton conduct on her part, had she been aware of Scott's presence. *Hemphill*, supra at 481 (2). Stewart was unaware of any previous act by Louis that would indicate his predisposition to play with fire. The only evidence of record of Louis even using matches prior to the fire was that he had, in the presence of his father and with his permission, lit a charcoal grill once and, also with his father's permission, lit a candle with a match at the Stewart home.

Even assuming that Louis's statement in 1998, two years after the fire, that he liked to strike matches "[o]nly for like thrills and stuff" was admissible and probative concerning Stewart's knowledge in 1996, this alone would not make her aware of a prior propensity to play with fire so as to create a duty to a social guest. As held in *Jackson v. Wimbley*, 218 Ga. App. 698 (1) (463 SE2d 48) (1995), even where a *parent* has, through negligence, allowed a child access to a dangerous instrumentality, if the parent did not *furnish* the instrumentality to the child, " 'the standard for imposing liability upon a parent is whether the parent knew of the child's proclivity or propensity for the specific dangerous activity.' "

If a parent[2] would not be liable under these circumstances and the trial court granted Stewart's motion for summary judgment on

---

[2] The dissent's attempt to craft a duty to supervise Louis onto Stewart despite the trial court's grant of summary judgment to her on the Harvards' negligent supervision claim against her is futile. Both cases relied upon by the dissent, *Herrin v. Lamar*, 106 Ga. App. 91 (126 SE2d 454) (1962) and *Davis v. Gavalas*, 37 Ga. App. 242 (139 SE 577) (1927), involve *parents* who provided dangerous instrumentalities to their children who then injured third parties, one on a public street and the other in the parents' yard. Neither dealt with premises liability. *Corley v. Lewless*, 227 Ga. 745, 748 (182 SE2d 766) (1971) describes *Herrin* and *Davis* as allowing recovery "where there was some *parental negligence* in furnishing or permitting a child access to an instrumentality with which the child likely would injure a third party." (Emphasis supplied.)

the negligent supervision claim, finding she had no duty to supervise Louis, there is no basis for any duty on her part merely because she was the homeowner. Therefore, as to the premises liability aspect of the Harvards' claim, Stewart was entitled to summary judgment.

3. Finally, Stewart contends that she should have been granted summary judgment on the Harvards' claim of attractive nuisance. Because the doctrine is not applicable to the present facts, we agree.

In *Gregory*, supra, the Supreme Court reviewed the evolution of the turntable or attractive nuisance doctrine in Georgia and adopted the five conditions set out by the Second Restatement of Torts for imposing liability pursuant to the doctrine.[3]

Even assuming that a matchbook located in a different room but in the same house as a dry Christmas tree can be considered, without more, an artificial condition on land which constitutes a threat to children,[4] the condition at issue here is whether " 'the children because of their youth [did] not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it.' " *Gregory*, supra at 154.

As set out in *Riley*, supra, fire is not such a condition because even young children have a natural fear of it. Here, Scott was eight years old, and even assuming, as stated by his parents, that he had never encountered a match or lighter in his home nor had the dangers of fire been discussed with him by them, at least by the time he and Louis moved from the kitchen into the living room where the tree was located, they had each struck and held matches until they could "feel the heat." Therefore, at that point, Scott was aware of the danger of fire, even had he not previously been, and of the fact that the Christmas tree was dry.

Therefore, Stewart was not liable under the attractive nuisance doctrine.

### Case No. A99A0635

4. The Harvards claim that Sidre, Jr. is liable for the death of their son because he negligently left Louis alone with his guest, Scott, and allowed them to have unsupervised control of a "dangerous instrumentality," the matchbook.

---

[3] We need not address, for purposes of this opinion, whether or not the doctrine applies only to trespassers. Compare *Gregory*, supra, with *Housing Auth. of Atlanta v. Famble*, 170 Ga. App. 509, 526-527 (317 SE2d 853) (1984).

[4] In *Cruce v. Kennington*, 220 Ga. App. 49 (2) (467 SE2d 227) (1996), this Court concluded that the mere existence of a barn, used or unused, was not an "artificial condition on land," nor did the mere existence of a hole in the second floor, covered by a board, constitute an unreasonable risk of death or serious bodily harm to children and it was not an attractive nuisance.

(a) Regarding this claim,

> [T]he true test of parental negligence *vel non* is whether in the exercise of ordinary care the parent should have anticipated that harm would result from the unsupervised activities of the child and whether, if so, the parent exercised the proper degree of care to guard against this result. (Cit.) *Hill v. Morrison*, 160 Ga. App. 151 (286 SE2d 467) (1981).

(Punctuation omitted.) *Manuel v. Koonce*, 206 Ga. App. 582, 584 (1) (b) (425 SE2d 921) (1992), overruled on other grounds, *Riley v. H & H Operations*, 263 Ga. 652 (436 SE2d 659) (1993).

In this regard, the evidence of record is that, while Louis was left home alone, Sidre, Jr. had instructed him to stay near a telephone and not have any visitors in the house. During the day, Sidre, Jr. repeatedly phoned and spoke with his son. He knew that, at some point in the midmorning, Scott and Louis were playing together outside, and as of 2:30 p.m., he knew that, in violation of the instructions he had given Louis, Scott was visiting in the house and that the two boys were watching a movie.

This is contrasted with the Harvards' situation which, without dispute, is that they had no contact with their son from 10:00 a.m. until 4:00 p.m. when Scott phoned them. They knew only that he was playing with Louis in the neighborhood.

Assuming, as claimed by the Harvards, that Sidre, Jr. had assumed some obligation to supervise their son based on his previous statement that Steven would always be there when he and Stewart were not, the evidence shows that, even though neither he nor Steven was present in the home, Sidre, Jr., via telephone, was periodically speaking with and checking on his son and Scott. In such a situation, the person undertaking care of a child is not an " 'insurer of the safety of the child. He is required only to use reasonable care commensurate with the reasonably foreseeable risk of harm.' " *Hemphill*, supra at 480 (1).

Regarding the matches as a dangerous instrumentality and the foreseeability of the risk of harm to the boys from them and the dry tree, the evidence is undisputed that Scott had never shown any predisposition to play with matches or fire. Louis had been instructed by Sidre, Jr. regarding the dangers of fire, including Sidre, Jr.'s taking him to fire stations for instruction. Louis's lighting of the grill and candle was done with his father's permission.

Even assuming that the 1998 statement regarding striking matches for "thrills and stuff" is admissible regarding Sidre, Jr.'s knowledge in 1996, such knowledge, as discussed in Division 2, supra, without more, is insufficient for imposition of liability on a

parent because there is no evidence that Sidre, Jr. furnished the dangerous instrumentality to Louis or Scott or had any knowledge of any dangerous propensity on either child's part. *Bunn*, supra at 744-745 (1); *Jackson*, supra.

In *Hawkins v. Skelly*, 212 Ga. App. 267 (441 SE2d 439) (1994), three boys, all under age 13, were playing with a plastic baseball bat, hitting rocks with it. Plaintiff Hawkins's eye was injured when Skelly threw a rock at which Bassinger swung and the rock ricocheted off a tree. Skelly, Bassinger, and their fathers were sued by Hawkins. This Court upheld the grant of summary judgment to Skelly's father, finding that he had no knowledge of any such prior activity by his son.

> The onus a parent's responsibility has been limited to such instances where the parent has taken some active part in the creation of the danger. A failure to supervise or regulate the play is not such an active part, because in our society strict control of children is today so rare that its absence is no indication of a lack of reasonable care. (Citation and punctuation omitted.) *Assurance Co. of America v. Bell*, 108 Ga. App. 766, 774 (4) (134 SE2d 540) (1963).

(Punctuation omitted.) Id. at 268. See also *Saenz v. Andrus*, 195 Ga. App. 431, 432 (2) (393 SE2d 724) (1990).

Therefore, Sidre, Jr. was entitled to summary judgment on this ground.

(b) There is also an additional basis upon which summary judgment should have been granted.

As discussed above, at least by the time the boys went into the living room, they were both aware of the dangers of a lighted match. They both knew, according to the Harvards' claim, that the tree was dry. Nonetheless, Scott sprayed a flammable substance, hair spray, within four or five feet of the dry tree, and the boys continued to light matches.

> Although assumption of the risk is ordinarily a jury question, in plain, palpable and indisputable cases, it may be decided as a matter of law. *Young v. Brandt*, 225 Ga. App. 889, 891 (485 SE2d 519) (1997). In order to establish the defense of assumption of the risk, [Sidre, Jr.] was required to show that [Scott Harvard] (1) had actual knowledge of the danger; (2) understood and appreciated the risks associated with such danger; and (3) voluntarily exposed [him]self to those risks. (Footnote omitted.) *Vaughn v. Pleasent*, 266 Ga. 862, 864 (1) (471 SE2d 866) (1996). As to a child between the ages of seven and fourteen, there is no presumption that the

child did or did not exercise due care or does or does not have sufficient capacity to recognize danger or to observe due care. (Citations and punctuation omitted.) *Jackson v. Young*, 125 Ga. App. 342, 343-344 (187 SE2d 564) (1972). For children between these ages, these issues hinge on the circumstances of the case and the capacity of the particular child. Id. at 344. Nevertheless, there is no bar to applying assumption of the risk, as a matter of law, to the conduct of a child between these ages when the evidence shows that the danger was obvious, that the child knew of the danger and was able to appreciate the risks associated with it, and the child voluntarily chose to run the risk. *Abee v. Stone Mountain Mem. Assn.*, 252 Ga. 465, 466 (314 SE2d 444) (1984), affirming 169 Ga. App. 167 (312 SE2d 142) (1983).

(Punctuation omitted.) *Goodman v. City of Smyrna*, 230 Ga. App. 630, 631-632 (497 SE2d 372) (1998) (physical precedent). See also *Barnes v. Fulton*, 213 Ga. App. 806 (446 SE2d 213) (1994).

As noted in *Gregory*, supra; *Goodman*, supra; and *Riley v. Brasunas*, supra, the dangers of fire are considered to be understood by even a young child absent factors creating additional risks which could not be appreciated by the child. There was none here.

Therefore, Sidre, Jr. was entitled to summary judgment.

On remand, the trial court is directed to enter summary judgment in favor of Stewart and Sidre, Jr.

*Judgments reversed with direction. Johnson, C. J., Pope, P. J., Smith and Ruffin, JJ., concur. McMurray, P. J., and Eldridge, J., dissent.*

McMURRAY, Presiding Judge, dissenting.

I respectfully dissent as I believe the trial court correctly decided that genuine issues of material fact remain as to both Kathleen Stewart's and L. E. Sidre, Jr.'s liability for jointly deciding to leave ten-year-old Louis Sidre at home alone — knowing that Louis' regular (daily) playmate, eight-year-old Scott Harvard, would likely be visiting. To this extent, I cannot go along with the majority's premises liability analysis with regard to Kathleen Stewart's liability because she was not L. E. Sidre, Jr.'s landlord.[5] She was his fiancé

---

[5] But even assuming premises liability is the appropriate standard, I do not agree that eight-year-old Scott Harvard was a licensee to whom Stewart owed only a duty not to act wilfully and wantonly. Because there is proof that this child was a daily guest inside and outside Kathleen Stewart's home, I believe a jury would be authorized in finding that she knew or should have known that Scott Harvard would be in her home on the day in question and that she thus had a duty to exercise ordinary care in watching out for his safety. After a proprietor becomes aware of a person's presence, the duty to exercise ordinary care is owed

and was residing together with Sidre and his son as a family. I believe that a jury would therefore be authorized in finding that Kathleen Stewart stood in loco parentis to ten-year-old Louis Sidre on the day of the fatal fire and that she, as a consequence, should be judged by a jury, along with L. E. Sidre, Jr., for deciding to leave ten-year-old Louis Sidre at home alone for an entire day — with no adult contact or supervision.

Scott Harvard died from smoke and heat inhalation because he and Louis Sidre were, in the absence of adult supervision, playing with carelessly placed matches near a dry Christmas tree in a home with a defective fire extinguisher and a front door dead bolted from the inside. After the tree caught fire and the boys failed to put it out with the fire extinguisher, they attempted to escape through the front door, but the door was locked from the inside and the key could not be found through the smoke of the developing fire. Ten-year-old Louis Sidre discovered an escape route through a back bedroom window, but eight-year-old Scott Harvard could not find his way. Frightened and lost in the smoke, young Scott Harvard hid under a bed. The child's body was discovered after the fire.

While I agree the law does not require constant vigil over children in all cases, absent circumstances requiring such action (*Hill v. Morrison*, 160 Ga. App. 151 (286 SE2d 467); *Scarboro v. Lauk*, 133 Ga. App. 359, 361 (2) (210 SE2d 848)), I believe Georgia demands adult accountability for any alleged failure to provide basic care and supervision to children of tender years. For instance, in *Davis v. Gavalas*, 37 Ga. App. 242 (139 SE 577), this Court held parents accountable for allowing their five-year-old child to ride a velocipede at night. And in *Herrin v. Lamar*, 106 Ga. App. 91 (126 SE2d 454), this Court held a mother accountable for allowing her ten-year-old daughter to operate a riding lawnmower. Unlike the majority's analysis in the case sub judice, these decisions are not based upon a foreseeable risk of harm stemming from a specific activity, nor upon the absence of proof regarding parental knowledge of a child's alleged careless or reckless nature. *Davis* and *Herrin* are based upon the general notion of adult responsibility for basic care and supervision of young children. The same logic persuades me to reject the majority's "known hazard" and "premises liability" rationale and to voice support for a view which would hold adults answerable for the conduct and activity of unsupervised children of tender years to whom they are charged with care. I thus believe a jury should decide whether Kathleen Stewart and L. E. Sidre, Jr. are responsible for the

---

whether the person is a licensee or an invitee. *Herrin v. Lamar*, 106 Ga. App. 91, 92 (1) (126 SE2d 454).

consequences of leaving young Louis Sidre at home alone, without adult supervision, control, or protection. Scott Harvard's parents' alleged negligent supervision of their son would, in my view, be but another factor for jury resolution.

I am authorized to state that Judge Eldridge joins in this dissent.

DECIDED JULY 14, 1999 —
RECONSIDERATION DENIED JULY 29, 1999 

*Gray, Hedrick & Edenfield, L. Bruce Hedrick*, for appellants (case no. A99A0634).

*Kenneth C. Pollock*, for appellant (case no. A99A0635).

*Mills, Moraitakis & Kushel, Nicholas C. Moraitakis*, for appellees.